NICHOLAS J. SANTORO, ESQ.
Nevada Bar No. 532
JASON D. SMITH, ESQ.
Nevada Bar No. 9691
**SPENCER FANE**
300 South Fourth Street, Suite 1600
Las Vegas, Nevada 89101
Tel.: (702) 408-3400/ Fax: (702) 408-3401
Email: nsantoro@spencerfane.com
         jdsmith@spencerfane.com

CHING-LEE FUKUDA *(pro hac vice)*
SHARON LEE *(pro hac vice)*
**SIDLEY AUSTIN LLP**
787 Seventh Avenue
New York, NY 10019
(212) 839-5300
Email: clfukuda@sidley.com
         sharon.lee@sidley.com

JOSHUA J. FOUGERE *(pro hac vice)*
**SIDLEY AUSTIN LLP**
1501 K Street, N.W. #600
Washington, DC 20005
(202) 736-8000
Email: jfougere@sidley.com


*Attorneys for Plaintiffs Evolution Malta Ltd., Evolution Gaming Malta, Ltd., Evolution Gaming Ltd., and SIA Evolution Latvia*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| EVOLUTION MALTA LIMITED, EVOLUTION GAMING MALTA LIMITED, EVOLUTION GAMING LIMITED, and SIA EVOLUTION LATVIA, | Case No.: 2:24-cv-00993-CDS-EJY |
| Plaintiffs, | **FIRST AMENDED COMPLAINT** |
| v. | **JURY DEMAND** |
| LIGHT & WONDER, INC. f/k/a SCIENTIFIC GAMES CORP. and LNW GAMING, INC. f/k/a SG GAMING, INC., | |
| Defendants. | |

Plaintiffs Evolution Malta Limited, Evolution Gaming Malta Limited, Evolution Gaming Limited, and SIA Evolution Latvia (collectively, "Evolution"), by and through their undersigned counsel, file this First Amended Complaint seeking a declaration and judgment that Defendants Light & Wonder, Inc. f/k/a Scientific Games Corp. ("Light & Wonder") and LNW Gaming, Inc. f/k/a SG Gaming, Inc. ("LNW Gaming") (collectively, "L&W") misappropriated Evolution's trade secrets and deliberately and willfully infringe U.S. Patent Nos. 10,629,024 ("the '024 patent"), 11,011,014 ("the '014 patent"), and 11,756,371 ("the '371 patent") (collectively, the "Asserted Patents").

## THE PARTIES

1.      Plaintiff Evolution Malta Limited is a Maltese company with its principal place of business at Level 1, Spinola Park, Mikiel Ang. Borg Street, St. Julians SPK1000, Malta.

2.      Plaintiff Evolution Gaming Malta Limited is a Maltese company with its principal place of business at Spinola  Park, Level 1, Mikiel Ang. Borg Street, St. Julians, SPK 1000, Malta.

3.      Plaintiff Evolution Gaming Limited is a corporation organized and existing under the laws of the United Kingdom with its principal place of business at 5th Floor, 1 Bolton Street, London, England W1J 8BA, United Kingdom.

4.      Plaintiff SIA Evolution Latvia is a Latvian company with its principal place of business at Brivibas Street 151, Riga, LV-1012, Latvia.

5.      Defendant Light & Wonder is a Nevada corporation with its principal place of business at 6601 Bermuda Road, Las Vegas, Nevada 89119.  Defendant LNW Gaming is a Nevada corporation with its principal place of business at 6601 Bermuda Road, Las Vegas, Nevada 89119.  Upon information and belief, LNW Gaming operates as a wholly-owned subsidiary of Light & Wonder, acts at Light & Wonder's direction and control and for Light & Wonder's direct benefit, and is controlled by Light & Wonder.

6.      Joinder is proper under 35 U.S.C. § 299.  Evolution's allegations are asserted against the Defendants jointly, severally, or in the alternative, arise, at least in part, out of

the same series of transactions or occurrences relating to Defendants' manufacture, use, sale, offer for sale, and/or importation of the same infringing products.  Defendants are part of the same corporate family and Evolution's allegations arise, at least in part, from Defendants' collective activities with respect to the infringing products.  Questions of fact common to Defendants will arise in this action, including questions relating to the structure and operation of the infringing products and Defendants' infringing acts.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a), and 18 U.S.C. § 1836(c).  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because they are sufficiently related to the federal claims so as to form part of the same case or controversy.

8.    This Court has personal jurisdiction over Light & Wonder and LNW Gaming because they are Nevada corporations.  Upon information and belief, Light & Wonder and LNW Gaming are residents of this judicial district, have systematic and continuous contacts in this judicial district, regularly transact business within this district, and regularly avail themselves of the benefits of this district.

9.    Venue is proper in this District under 28 U.S.C. §§ 1391(b) and 1400(b) because Light & Wonder and LNW Gaming reside in this District.

## NATURE OF THE ACTION

### Factual Background

10.    This case arises out of L&W's use of, without authorization or license, Evolution's intellectual property, including L&W's willful and malicious misappropriation of Evolution's highly valuable trade secrets and L&W's willful infringement of patents that protect Evolution's technology.

11. Evolution is a leading provider of fully-integrated software casino solutions to online gaming operators and land-based casinos.[1] Evolution was founded in 2006 as one of the first providers of B2B live casino solutions in Europe. Live casinos are a form of online gambling where the games are facilitated in real-time by a human dealer and players can place wagers and participate online. Live casinos have become immensely popular among players because they replicate online the environment of a land-based casino. Due to its industry-leading solutions, Evolution has been named Live Casino Supplier of the Year at the EGR B2B Awards, which reward the best service providers in the online gaming industry, 12 years in a row.[2]

12. L&W is a "cross-platform global games company with a focus on content and digital markets."[3] L&W supplies gaming machines, gaming content, casino management systems, and table game products and services to licensed gaming entities, such as casinos.[4] According to L&W, its products are installed in all of the major regulated U.S. gaming jurisdictions.[5]

13. In 2018, Evolution launched its Lightning Roulette game in an online live version format. Lightning Roulette was unlike any other roulette game that came before it. In traditional roulette, a player physically places a bet on a number that corresponds to a position on the roulette wheel (e.g., by placing betting chips on the number). If the ball lands in that position, the live dealer awards the player with a standard payout of 35:1 (e.g., by awarding chips to the player). Unlike traditional roulette, in Lightning Roulette, one or more players place bets electronically through player devices. In addition, unlike traditional roulette, in every round, Lightning Roulette includes software that randomly or pseudo-randomly selects one or more numbers on the roulette wheel as "Lucky Numbers" that are each assigned an increased payout

---

[1] *See* https://www.evolution.com/company-overview.

[2] *See* https://www.evolution.com/news/five-wins-for-evolution-group-at-egr-b2b-awards-including-live-casino-supplier-of-the-year-for-12th-year-running/.

[3] Light & Wonder, Inc., Annual Report (Form 10-K) (for fiscal year ending Dec. 31, 2023) at 8.

[4] *Id.*

[5] *Id.* at 9.

(*e.g.*, between 50x and 500x) by the software.[6] If the ball lands in one of the selected "Lucky Numbers" on the roulette wheel for that round, the software indicates the payouts to be made and pays out each player who bet on that number according to the multiplier assigned to that number, payout which is higher than the payout for positions without a multiplier. Lightning Roulette also decreases the standard payout for numbers that are not selected as "Lucky Numbers" to balance out the increased payouts for numbers with multipliers. The opportunity to win increased payouts makes Lightning Roulette is highly attractive to players and the adjusted standard payouts ensure the game remains highly profitable.

14.     Lightning Roulette is also a hybrid game that combines the use of mechanically-generated game values (e.g., roulette number on which ball lands after spin) and electronically-generated game values (e.g., "Lucky Numbers" and multipliers). Because players tend to distrust purely electronic games (e.g., through belief that such games are manipulated), Lightning Roulette's use of both game values that are mechanically generated (e.g., by using a physical roulette wheel and ball) and electronically-generated game values to improve player trust (and thus more player engagement) while allowing for more flexible and diverse gameplay.

15.     In the online live version, users are able to participate online in a game that is hosted by a live dealer.[7] Lightning Roulette, due to its unique formatting and features, has been hugely successful and is enjoyed by millions of players around the world.[8] Indeed, Lightning Roulette is the largest and most profitable roulette game in the world.

16.     In 2022, building on Lightning Roulette's success, Evolution launched XXXtreme Lightning Roulette, which also randomly selects between one and five "Lightning

---

[6] *See* https://games.evolution.com/live-casino/live-roulette/lightning-roulette/.

[7] *See* https://www.evolution.com/games/live-roulette/.

[8] *See, e.g.*, https://evolution.com/news/evolution-and-scientific-games-strike-land-based-lightning-roulette-deal.

Numbers" that are assigned multipliers from 50x up to 500x.[9]  In XXXtreme Lightning Roulette, however, the numbers can be selected again potentially increasing multipliers up to 2,000x.[10]

17.    The U.S. Patent and Trademark Office awarded Evolution several patents for the innovations embodied in Lightning Roulette, including the '024, '014, and '371 patents. The gaming industry has also recognized Lightning Roulette's innovation and contribution to the field and awarded Evolution a number of prestigious awards for Lightning Roulette.

18.    For example, Lightning Roulette was awarded Product Innovation of the Year at the 2018 Global Gaming Awards, which recognized Lightning Roulette as "the most revolutionary product in the last 12 months."[11]  The Product Innovation of the Year award is "one of the most prestigious awards to win."[12]

19.    Lightning Roulette was also the winner of the Product Innovation of the Year award at the 2018 Global Gaming Expo (G2E), beating nine other shortlisted candidates and "prov[ing] that its sophisticated software contributions to the industry in both sectors (land-based, as well as digital) have been unsurpassed in the past 12 months."[13]

20.    Lightning Roulette was also named Game of the Year at the EGR Operator Awards in 2018 and recognized as the game "making the biggest annual impact."[14]  The EGR Operator Awards are considered the "Oscars of the egaming sector" and reward operators for

---

[9] *See* https://www.evolution.com/news/evolution-launches-xxxtreme-lightning-roulette-latest-lightning-family-live-casino-games/.

[10] *Id.*

[11] https://www.globalgamingawards.com/vegas/2018/; https://www.gamblinginsider.com/news/6039/global-gaming-awards-las-vegas-2018-winners-revealed.

[12] https://stargambling.net/news/global-gaming-awards-2018-vegas.html.

[13] https://www.realmoneyaction.com/evolution-gaming-wins-product-innovation-of-the-year-at-g2e/.

[14] https://lcb.org/news/evolution-s-lightning-roulette-voted-goty-at-egr.

"setting the [industry] standard."[15]  The Game of the Year winner is decided by votes by peer operators who were shortlisted for one of the awards.[16]

21.    Lightning Roulette was also awarded Game of the Year at the American Gambling Awards in 2022.[17]

22.    L&W's former Senior Vice President of Global Systems and Table Games recognized what a "phenomenal success" Lightning Roulette has been and attributed that success to "provid[ing] a truly unique roulette experience for players."[18]

23.    Evolution sought to build on the success of the online live version of Lightning Roulette and increase its brand exposure and potential market.  Evolution thus identified potential partners who could help bring Lightning Roulette to land-based casinos worldwide, including in the United States.  Not surprisingly, numerous companies, recognizing Lightning Roulette's success and the huge earning opportunity associated with producing a version for land-based casinos, expressed interest in partnering with Evolution for this opportunity.

24.    Evolution began negotiating the terms of an agreement with a competitor of L&W to develop a land-based version of Lightning Roulette.  After Evolution's negotiations with that company began, L&W (at the time, Scientific Games) expressed its interest in partnering with Evolution to develop the land-based version of Lightning Roulette.  Accordingly, Evolution was engaged in parallel negotiations with L&W and L&W's competitor.

25.    Over the ensuing months, LNW Gaming (at the time, SG Gaming, Inc.) and Evolution negotiated the terms of an agreement for producing a physical Lightning Roulette game table to be placed in land-based casinos.  The parties first negotiated the terms of a Mutual Non-Disclosure Agreement (hereinafter, the "NDA") to protect confidential information that the parties may exchange in connection with discussions related to the development of a land-based version

---

[15] https://egr.global/events/egr-operator-awards-2018/.

[16] https://lcb.org/news/evolution-s-lightning-roulette-voted-goty-at-egr.

[17] https://www.evolution.com/games/lightning-roulette/.

[18] https://evolution.com/news/evolution-and-scientific-games-strike-land-based-lightning-roulette-deal.

of Lightning Roulette.  The parties agreed to the terms of the NDA on February 18, 2020.  Under Section 3(b) of the NDA, L&W was allowed to use Evolution's confidential information only to the extent necessary to evaluate the possibility of developing a land-based version of Lightning Roulette, and "not for any other purpose."  Moreover, as reflected in Section 11 of the NDA, the parties agreed that L&W's breach of the NDA would irreparably harm Evolution and that money damages alone would be an inadequate remedy.

26.    During the course of the parties' negotiations, LNW Gaming continuously delayed the progress of negotiations.  As Evolution repeatedly told LNW Gaming, it was extremely important to Evolution for the first land-based Lightning Roulette game tables to be placed in land-based casinos by January 2022, to coincide with Evolution's planned U.S. launch of the online version of Lightning Roulette.  It was not until Evolution informed LNW Gaming that Evolution would pursue an arrangement with one of LNW Gaming's competitors if LNW Gaming continued to delay negotiations that LNW Gaming finally re-engaged in negotiations.

27.    The parties then entered into a Heads of Terms on March 8, 2021 to set out their common understanding of the terms of the arrangement.  That Heads of Terms included a Confidentiality provision whereby the parties agreed not to use the other party's confidential information for any purpose other than to perform their obligations under the Heads of Terms.  The Heads of Terms identified some of Evolution's intellectual property that protects Lightning Roulette, including the '024 patent and the application that led to the '014 patent.

28.    After the parties agreed to the terms of the NDA and Heads of Terms, Evolution disclosed to LNW Gaming Evolution's proprietary and confidential information regarding Lightning Roulette for the strict purpose of LNW Gaming using that information to develop physical Lightning Roulette game tables.  For example, in early March 2021, Evolution's then Director of Product, provided to L&W's then Executive Director of Table Games Development, two math files for Lightning Roulette.  These math files, which are each prominently marked "COMPANY CONFIDENTIAL" at the top, lay out the underlying math for the Lightning Roulette game, including the frequency with which each multiplier is selected, the frequency with

which the roulette numbers are selected as "Lucky Numbers," and the frequency with which the ball lands on a roulette number.  This information is proprietary, unique to the Lightning Roulette game, and cannot be readily ascertained through proper means, including by observing the Lightning Roulette features or by playing the game.  The proprietary information allows, among other things, the game to remain profitable despite the inclusion of multipliers with increased payouts and increases player engagement with the game.

29.    Evolution spent significant time and resources developing the math files for Lightning Roulette and Lightning Roulette's success is attributable, at least in part, to the information in these math files.  At LNW Gaming's request, Evolution also had a subsequent telephone conversation with a number of L&W's employees, including L&W's then Senior Game Producer, to explain the contents of the math files.

30.    Evolution and LNW Gaming ultimately entered into an agreement on March 29, 2021 that required LNW Gaming to develop and manufacture a physical Lightning Roulette game table to be placed in land-based casinos beginning in January 2022 (hereinafter, the "Agreement").  Evolution granted LNW Gaming an exclusive license to certain of Evolution's intellectual property, including the Asserted Patents, but only for purposes of developing a physical Lightning Roulette game table to be placed in land-based casinos.  Through this arrangement with LNW Gaming, Lightning Roulette, which had exclusively been available online, would be introduced for the first time in land-based casinos.

31.    The Agreement reiterated LNW Gaming's obligations to maintain the confidentiality of Evolution's confidential and proprietary information, which includes the Lightning Roulette math files, and not to use Evolution's confidential and proprietary information for LNW Gaming's own or anyone else's benefit.  The Agreement further provided that Evolution's disclosure of confidential and proprietary information to LNW Gaming shall not be construed as a grant of any rights in or license to that information.  The Agreement further expressly prohibited LNW Gaming from using Evolution's intellectual property to create physical table games that would compete with a physical Lightning Roulette game table.  LNW Gaming

again acknowledged in the Agreement that Evolution would be "damaged irreparably if any of the provisions of this Agreement (specifically including the obligations of confidentiality set forth in paragraph 7 herein) are not performed in accordance with their specific terms or otherwise are breached."

32.    After entering into the Agreement, Evolution publicly announced that it had entered into an exclusive agreement with L&W (then, Scientific Games) to make Evolution's multi-award winning live online Lightning Roulette game available as a physical game in land-based casinos worldwide.[19]  That press release included the following quote from L&W's then Senior Vice President of Global Systems and Table Games:

> We have watched Lightning Roulette's phenomenal success in a live-dealer, online format and cannot wait to make it available on gaming floors of land-based casinos across North America and around the world. With its trademark lightning strikes and big-win multipliers, Lightning Roulette is sure to be one of the most visually engaging and entertaining live table games ever offered. It provides a truly unique roulette experience for players and we are confident that in its land-based form, scheduled for go-live in 2022, it will be an absolute star attraction.[20]

33.    Over the ensuing months, LNW Gaming led Evolution to believe that it was working on developing the Lightning Roulette game tables pursuant to the parties' Agreement. However, in August 2021 and much to Evolution's surprise, LNW Gaming attempted to unilaterally terminate the parties' Agreement.  Evolution also learned that LNW Gaming was falsely informing Evolution customers that the Agreement had been terminated.

34.    Even more disturbingly, L&W announced the launch of its own copycat roulette game, called RouletteX.  L&W has released RouletteX in at least two different forms: in an electronic table game format, which, according to L&W, "demonstrates the Company's passion to cultivate unique gaming experiences in the rapidly growing [electronic table game] sector," and

---

[19] https://www.prnewswire.com/news-releases/evolution-and-scientific-games-strike-land-based-lightning-roulette-deal-301300565.html.

[20] *Id.*

in a physical table game format, like the type it was supposed to—but failed to—make for Lightning Roulette.[21]

35.    RouletteX's appearance, features, and functionality are strikingly similar to Lightning Roulette.  For example, RouletteX—like Lightning Roulette—randomly selects up to five roulette numbers and assigns multipliers from 50x to 500x to those randomly selected numbers for each roulette spin.[22]  RouletteX even identifies these randomly selected numbers with an animated lightning strike, like Lightning Roulette.  If the ball falls into one of those randomly selected roulette numbers and the player bet on that number, then RouletteX pays out according to the assigned multiplier, again like Lightning Roulette.

36.    L&W petitioned the Pennsylvania Gaming Control Board to add a temporary regulation (58 Pa. Code § 617b.5) allowing certificate holders in Pennsylvania to offer RouletteX.  The temporary regulation states that "Roulette X is similar to already authorized Lightning Roulette in that it incorporates increased payout odds being randomly applied to the Roulette table."[23]  Because "Roulette X, [is] a variation on Lightning Roulette," the temporary regulation provides that RouletteX "shall follow the rules and procedures of Lightning Roulette under § 617b.3 (relating to Lightning Roulette)."[24]

37.    According to L&W's Senior Vice President of Global Table Gaming, RouletteX is "a very big product for [L&W]" that is "in the field" and "driving a ton of excitement."[25]  In fact, L&W sees RouletteX as its "number one product right now in [L&W]'s

---

[21] https://explore.lnw.com/newsroom/scientific-games-is-driving-the-future-of-gaming/; *see also, e.g.*, https://www.youtube.com/watch?v=7e22FFSWTac at 0:22, 0:43, 0:53.

[22] *See, e.g.*, https://www.indiangaming.com/light-wonder-roulette-x/; *see also* https://www.youtube.com/watch?v=gSD-ynTxJ8M.

[23] 54 Pa. Bull. 1537, 1541 (March 23, 2024), *available at* https://www.pacodeandbulletin.gov/Display/pabull?file=/secure/pabulletin/data/vol54/54-12/398.html&search=1&searchunitkeywords=125-248.

[24] *Id.*

[25] https://www.youtube.com/watch?v=B9sGivHKgiA.

ETG space."[26]  He further explained that "players love it," "operators love it," and "naturally [L&W] love[s] it."[27]

38.    Upon information and belief, L&W manufactures RouletteX within the United States and/or imports, uses, offers to sell, sells, and/or has sold RouletteX in the United States.[28]

39.    Upon learning about L&W's copycat RouletteX game, Evolution sent L&W a letter, dated February 28, 2022, demanding that L&W immediately take all necessary steps to refrain from further violation of Evolution's intellectual property.  In that letter, Evolution explained that L&W's unauthorized use of Evolution's trade secrets, including the Lightning Roulette math files, to develop and launch its own copycat RouletteX game constitutes trade secret misappropriation under applicable federal and state law.  Evolution also specifically identified the '024 and '014 patents—the '371 patent's grandparent and parent patents, respectively—and explained how L&W's RouletteX infringes one or more claims of those patents.

40.    L&W, however, has refused to cease its violation of Evolution's intellectual property rights.  Instead, L&W doubled down on its infringement and released in the following year another copycat roulette game, called PowerX, which L&W touted as one of its "innovative offerings."[29]  Like RouletteX, PowerX "randomly select[s] numbers enriched with multipliers of 50x, 100x, 250x, or even 750x the value.  If a player's chosen number matches these multipliers

---

[26] *Id.*

[27] *Id.*

[28] *See* https://www.linkedin.com/posts/lightnwonder_youre-looking-at-the-very-first-install-activity-7043692695092924416-kS6u?utm_source=share&utm_medium=member_desktop (displaying RouletteX set-up at Four Winds Casino).  Upon information and belief, Four Winds Casino operates casinos in Michigan.  *See* https://fourwindscasino.com/.  *See also* 54 Pa. Bull. 1537, 1541 (March 23, 2024) (adopting temporary regulation § 617b.5, permitting certificate holders to offer RouletteX in Pennsylvania); https://igaming.lnw.com/games/roulette-x/ ("Welcome to Roulette X, an exhilarating, supercharged bonus roulette experience that has already become a renowned brand in land-based casinos worldwide!").  RouletteX is also available at the MGM National Harbor casino in Oxon Hill, Maryland.

[29] *See* https://explore.lnw.com/newsroom/light-wonder-unveils-innovative-offerings-at-g2e-2023/.

upon winning, their credits skyrocket."[30]  According to L&W's Senior Vice President of Global Table Gaming, PowerX, like RouletteX, includes "all the great multipliers but then also with a progressive option."[31]  According to L&W, PowerX is a "first-of-its-kind standalone roulette progressive" that, unlike RouletteX, allows a player to "sit down and play their own roulette game and not have to wait for the whole table to make bets."[32]  Upon information and belief, L&W manufactures PowerX within the United States and/or imports, uses, offers to sell, sells, and/or has sold PowerX in the United States.

41.    Evolution sent L&W another letter, dated April 24, 2024, regarding its ongoing violation of Evolution's intellectual property and again demanded that L&W immediately take all necessary steps to refrain from further violation of Evolution's intellectual property.  In that letter, Evolution again explained that L&W's improper use of Evolution's trade secrets, including the Lightning Roulette math files, to develop and launch its own copycat games constitutes trade secret misappropriation under applicable federal and state law.  Evolution also specifically identified the '024, '014, and '371 patents.  Evolution reiterated its notice from its previous February 28, 2022 letter that L&W's RouletteX game infringes one or more claims of the '024 and '014 patents, and also explained how L&W's RouletteX and PowerX copycat games infringe one or more claims of the '371 patent.

42.    L&W again refused to cease its violation of Evolution's intellectual property rights.  Thus, on May 28, 2024, Evolution filed a complaint with this Court for trade secret misappropriation and patent infringement of the '024, '014, and '371 patents.[33]

43.    Five months after Evolution filed the pending lawsuit, L&W revealed yet another copycat game—88 Fortunes Blaze Live Roulette—at the October 2024 G2E Global

---

[30] https://www.indiangaming.com/light-wonder-power-x-roulette/.

[31] https://www.youtube.com/watch?v=B9sGivHKgiA.

[32] https://cdcgaming.com/light-wonder-introduces-ruyi-baccarat-at-g2e/.

[33] On February 11, 2025, this Court granted L&W's Motion to Dismiss Evolution's patent infringement claims and granted leave for Evolution to re-assert the '024, '014, and '371 patents in an amended complaint.  ECF No. 76.

Gaming Expo in Las Vegas.[34]  L&W launched 88 Fortunes Blaze Live Roulette no later than January 2025 when it posted about the game on its LinkedIn page and its YouTube channel.[35]

44.     88 Fortunes Blaze Live Roulette is a live casino game that combines a physical roulette wheel and electronically generated multipliers for increased payouts that are assigned to certain roulette numbers each game.[36]  L&W broadcasts 88 Fortunes Blaze Live Roulette from its studios in Michigan[37] and/or elsewhere in the United States.[38]  For example, in January 2025, L&W claimed that it has "two live games operating in Europe and the US" that broadcast 88 Fortunes Blaze Live Roulette.[39]

45.     Evolution sent L&W yet another letter, dated March 14, 2025, regarding its ongoing violation of Evolution's intellectual property and again demanded that L&W immediately cease all infringing activities.  In that letter, Evolution reiterated its notice from its previous letters and filings in the pending litigation, including its January 17, 2025 infringement contentions, that L&W's RouletteX and PowerX systems infringe one or more claims of the '024, '014, and/or '371 patents.

46.     In that same letter, Evolution additionally provided notice that L&W's 88 Fortunes Blaze Live Roulette system infringes Evolution's '024, '014, and '371 patents.  Evolution explained in detail in this letter and in claim charts attached to the letter how L&W's RouletteX and 88 Fortunes Blaze Live Roulette systems infringe.

47.     Evolution will be irreparably harmed if L&W is permitted to continue to manufacture, import, use, offer to sell, and/or sell systems that were developed using Evolution's

---

[34] *See, e.g.*, https://www.youtube.com/watch?v=AItaRI6iaCo.

[35] *See, e.g.*, https://www.linkedin.com/posts/lnw-live_88fortuneslive-livecasino-fortunatenewyear-activity-7279830021098098689-Ej2e/?utm_source=share&utm_medium=member_desktop

[36] *See, e.g.*, https://www.youtube.com/watch?v=x0ZtuyrMqmQ.

[37] *See* https://explore.lnw.com/newsroom/light-wonder-premium-live-dealer-by-authentic-gaming-goes-live-with-betrivers-in-landmark-u-s-launch/.

[38] *See* https://www.youtube.com/watch?v=AItaRI6iaCo.

[39] *See* https://www.linkedin.com/posts/lnw-live_88fortuneslive-livecasino-fortunatenewyear-activity-7279830021098098689-Ej2e/?utm_source=share&utm_medium=member_desktop.

highly valuable trade secrets, and also infringe Evolution's patents. Evolution will be forced to compete against the very technology that it spent significant time and resources researching, developing, and bringing to market.

48. L&W's unlawful conduct has caused Evolution, among other things, reputational harm, loss of competitive advantage, loss of goodwill, lost compensation, and potential future economic loss. For example, Evolution publicly announced to the industry and its customers that, pursuant to the parties' Agreement, physical Lightning Roulette game tables would be available in land-based casinos beginning in January 2022. Rather than fulfill its obligations under the Agreement, however, L&W used Evolution's intellectual property to launch its own copycat roulette games and make them available in land-based casinos. By doing so, L&W prevented Evolution from delivering physical Lightning Roulette game tables to land-based casinos, as Evolution promised, and robbed Evolution of the opportunity to be the first company to launch its unique game in land-based casinos worldwide, including in the United States. L&W is instead brazenly touting itself as "the first to introduce this exciting gameplay to the market."[40]

49. Evolution Malta Limited is the owner of all rights, title, and interest in and to the '024 patent. The '024 patent issued on April 21, 2020, and is titled "Systems, Methods, and Media for Implementing Internet-Based Wagering." The '024 patent claims priority to a provisional patent application and the '024 patent has a priority date that is at least as early as February 5, 2018. A copy of the '024 patent is attached as Exhibit 1.

50. Evolution Malta Limited is the owner of all rights, title, and interest in and to the '014 patent. The '014 patent issued on May 18, 2021, and is titled "Systems, Methods, and Media for Implementing Internet-Based Wagering." The '014 patent is a continuation of U.S. Patent Application No. 16/268,218, which issued as the '024 patent, and the '014 patent has a priority date that is at least as early as February 5, 2018. A copy of the '014 patent is attached as Exhibit 3.

---

[40] https://explore.lnw.com/newsroom/light-wonder-illuminates-new-games-and-technology-at-niga-2022/.

51.    Evolution Malta Limited is the owner of all rights, title, and interest in and to the '371 patent.  The '371 patent issued on September 12, 2023, and is titled "Systems, Methods, and Media for Implementing Internet-Based Wagering."  The '371 patent is a continuation of U.S. Patent Application No. 16/852,049, which issued as the '014 patent, and the '371 patent has a priority date that is at least as early as February 5, 2018.  A copy of the '371 patent is attached as Exhibit 5.

## THE ASSERTED PATENTS ARE DIRECTED TO PATENT ELIGIBLE SUBJECT MATTER

52.    The Asserted Patents are directed to specific technological software improvements that fall outside the exceptions to patent eligible subject matters, and do not implicate pre-emption concerns.

53.    Section 101 defines patent-eligible subject matter using "expansive terms" that demonstrate that "Congress plainly contemplated that the patent laws would be given wide scope."[41]  Supreme Court precedent provides "three specific exceptions to [] § 101's broad patent-eligibility principles: laws of nature, physical phenomena, and abstract ideas."[42]

54.    The "concern that drives this exclusionary principle [is] one of pre-emption."[43]  That is because, if a patent claims nothing more than an abstract idea, allowing monopolization of that abstract idea "might tend to impede innovation more than it would tend to promote it, thereby thwarting the primary object of the patent laws."[44]

55.    The Supreme Court has cautioned, however, that courts should "tread carefully in construing this exclusionary principle" because "[a]t some level, all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas."[45]

---

[41] *Bilski v. Kappos*, 561 U.S. 593, 601 (2010) (internal citation omitted).

[42] *Id.*

[43] *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014).

[44] *Id.* (internal quotation omitted).

[45] *Id.* at 217 (internal quotations omitted).

"Applications of such concepts to a new and useful end . . . remain eligible for patent protection."[46] Only those claims "that claim the building blocks of human ingenuity," and thus "risk disproportionately tying up the use of the underlying ideas," are ineligible.[47]  Patents that "integrate the building blocks into something more," on the other hand, "pose no comparable risk of pre-emption, and therefore remain eligible for the monopoly granted under our patent laws."[48]

56.    The Supreme Court set forth a two-step framework for assessing eligibility. Courts must determine (1) whether the claims at issue are directed to a patent ineligible concept, such as an abstract idea, and, if they are, then (2) determine whether they nonetheless recite an inventive concept.[49]

**The Asserted Patents Are Not Directed to an Abstract Idea (*Alice* Step 1)**

57.    The Asserted Patents are not directed to an abstract idea, but are instead each directed to technological improvements in existing technology for new and improved games, including roulette, which encompass features that were not available in traditional or prior electronic versions of those games.

58.    At step one, the inquiry asks whether the claims of the Asserted Patents are "directed to one of [the] patent-ineligible concepts," such as an abstract idea.[50]  "[I]t is not enough to merely identify a patent-ineligible concept *underlying* the claim;" the question is "whether that patent-ineligible concept is what the claim is '*directed to*.'"[51]  "If the answer is no, the inquiry is over: the claim[s] fall[] within the ambit of § 101."[52]

---

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] *Id.* at 217–18.

[50] *Endo Pharm., Inc. v. Teva Pharm. USA*, 919 F.3d 1347, 1352 (Fed. Cir. 2019) (citing *Alice* 573 U.S. at 217).

[51] *Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1349 (Fed. Cir. 2017) (emphasis added) (internal citation omitted).

[52] *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1047 (Fed. Cir. 2016).

59.     The step one "directed to" analysis depends on a fair and accurate characterization of the claims.  The Federal Circuit cautions that courts "must be careful to avoid oversimplifying the claims" in a Section 101 analysis.[53]  The proper "directed to" inquiry considers whether the claims' "character as a whole is directed to excluded subject matter" and, in doing so, views the claims in light of the specification and prosecution history.[54]  The specification is often referenced in the step one analysis, as it "help[s] illuminate the true focus of a claim" (*i.e.*, what the claims are "directed to").[55]

60.     Under this framework, the Federal Circuit has upheld the eligibility of claims "directed to a patentable, technological improvement over . . . existing, manual . . . techniques."[56]  In that regard, there is a distinction between a "specific improvement to computer functionality," which generally has been held to be patentable, and a "process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool," which generally has been held to be not patentable.[57]  As the Federal Circuit has explained, "[s]oftware can make non-abstract improvements to computer technology just as hardware improvements can, and sometimes the improvements can be accomplished through either route. . . . Much of the advancement made in computer technology consists of improvements to software that, by their very nature, may not be defined by particular physical features but rather by logical structures and processes."[58]

---

[53] *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016) (quoting *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016)); *see also Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016) (overgeneralizing or oversimplifying the claims "all but ensures that the exceptions to § 101 swallow the rule").

[54] *Enfish*, 822 F.3d at 1335 (internal citation omitted).

[55] *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1374 (Fed. Cir. 2020); *see also Mentone Sols. LLC v. Digi Int'l Inc.*, Nos. 2021-1202, 2021-1203, 2021 U.S. App. LEXIS 33793, at *14 (Fed. Cir. Nov. 15, 2021) (nonprecedential) (reversing a finding that patent claims were directed to an abstract idea where the district court's interpretation of what the claims were directed to failed to capture certain elements of the invention and explaining "the specification informs our understanding of the claimed invention, the technological solution, and how the elements of the claim work together to provide that solution").

[56] *McRO*, 837 F.3d at 1316.

[57] *See, e.g.*, *Enfish*, 822 F.3d at 1336.

[58] *Id*. at 1335–39.

61.     Many cases recognize that such inventions are patent eligible.  In *McRO*, the patent claimed rules to "automat[e] part of a preexisting 3-D animation method."[59]  This was a "specific asserted improvement in computer animation," even if the "rules [we]re embodied in computer software that is processed by general-purpose computers."[60]  In *EcoServices, LLC v. Certified Aviation Servs., LLC*, the claims were "directed to an improved system for washing jet engines and not to an abstract idea" when that system, like in *McRO*, "employed a computer 'to perform a distinct process to automate a task previously performed by humans.'"[61]  The "system itself [wa]s new."[62]  And in *Contour IP Holding LLC v. GoPro, Inc*., the claims were "directed to a technological solution to a technological problem"—an improved point-of-view camera.[63]

62.     Similarly, in *DDR Holdings, LLC v. Hotels.com, L.P.*, the Federal Circuit upheld the eligibility of a patent directed to software for internet websites.  When a visitor on a host's website clicks on an advertisement for a third-party product, it creates a hybrid webpage that combines elements of the host's and third party's websites.[64]  While the claims "address[ed] a business challenge" of "retaining website visitors," they did "not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet."[65]  "Instead, the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks."[66]  The court emphasized that while the "concept" of a "store within a store" might have been conventional, implementation of that practice on the Internet, the patent "accounted for the

---

[59] *McRO*, 837 F.3d at 1303.

[60] *Id*. at 1314

[61] 830 F. App'x 634, 642–43 (Fed. Cir. 2020).

[62] *Id*. at 645.

[63] 113 F.4th 1373, 1380 (Fed. Cir. 2024).

[64] 773 F.3d 1245 (Fed. Cir. 2014).

[65] *Id*. at 1257.

[66] *Id*.

ephemeral nature of an Internet 'location'" and "the near-instantaneous transport between these locations" and thus solved a problem "that does not arise in the 'brick and mortar' context."[67]

63.    As these cases make clear, for the interplay between technological improvements and existing computers, the standard is *not* simply whether an innovative system, process, method, software, etc. can be carried out in existing computers.  Such rule would result in categorical exclusion from entitlement to patent rights for, and thus no innovation on, anything that can be processed by computers.

64.    These principles apply equally in the context of gaming-related technologies.  The Federal Circuit has stated, for instance, that "[not] all inventions in the gaming arts would be foreclosed from patent protection under § 101."[68]  And L&W itself has likewise told the U.S. Patent and Trademark Office that the Federal Circuit has been "careful to leave the door open to game-based inventions being patent-eligible," including "inventions in the gaming arts having new or original game elements."[69]

65.    Evolution's patents are much like the numerous patents district courts have upheld relating to inventions in gaming industry over Section 101 challenges.  In *Skillz Platform Inc. v. Aviagames Inc.*, for example, the patent related to systems and methods that use a pseudo-random number generator to synchronize gaming elements of separate wagering game instances being played on multiple devices in a online competition.[70]  The court rejected the defendant's overgeneralized characterization of the patent as directed to simply "managing a game so that multiple players experience common initial gameplay," reasoning that this characterization "only partially capture[d] the subject matter of the claims." The defendant "failed to heed the Federal Circuit's warning that 'describing the claims at such a high level of abstraction and untethered

---

[67] *Id*. at 1258.

[68] *See, e.g.*, *In re Smith*, 815 F.3d 816, 819 (Fed. Cir. 2016).

[69] ECF No. 53-2 at 9, Excerpt of U.S. Patent No. 11,302,152 File History.

[70] No. 21-cv-02436, 2022 U.S. Dist. LEXIS 45187, at *25–35 (N.D. Cal. Mar. 14, 2022).

from the language of the claims all but ensures that the exceptions to § 101 swallow the rule.'"[71] The patent was "directed to specific implementations using pseudo-random number seeds to standardize gameplay in an electronic skills-based game."[72]  The court thus credited the patentee's arguments that "the [patent] claims are directed to a specific improvement in computer technology"—an improvement in "how games are played in a computing environment."[73]  And the court found the defendant's arguments to the contrary (*i.e.*, that the claims "do not provide an improvement in computing technology, because they recite generic computer components and could be carried out by a human using pen and paper") "unavailing," particularly when the defendant "fail[ed] to identify a single example of a pseudo-random number generation function— let alone one that can be performed by a human."[74]

66.    Another court, in *Vetnos, LLC v. Sideprize LLC*, upheld a patent relating to a system for presenting a daily fantasy sports game where players can obtain a fixed prize by correctly predicting a number of "matchups" (*e.g.*, whether an athlete will score over or under a certain number of points in a game).[75]  The defendant in this case likewise "failed to look at the claims as a whole and [] oversimplified the focus of the claims" by characterizing the claims as directed to "the abstract ideas of collecting, analyzing, and presenting data so as to manage and operate skills-based contests."[76]  The court found that the claims "do not simply set forth game rules" or "simply display [] information, they do something with it, which amounts to significantly more than simply using a computer to implement an abstract idea."[77]

---

[71] *Id*. at *25–27.

[72] *Id*. at *26.

[73] *Id*. at *31.

[74] *Id*. at *33.

[75] No. 1:23-cv-2746, 2024 U.S. Dist. LEXIS 68535, at *4–6, 32–39 (N.D. Ga. Mar. 25, 2024), *R. & R. adopted*, 2024 U.S. Dist. LEXIS 147184 (July 9, 2024).

[76] *Id*. at *33, 35.

[77] *Id*. at *36–37; *Vetnos*, 2024 U.S. Dist. LEXIS 147184, at *11.

67.    In this District, too, another court declined to find patents ineligible that were "relat[ed] to online gambling."[78]  Like Evolution's patents, the patents in *CG Tech. Dev., LLC v. Bwin.party (USA), Inc.* claimed a processor executing software instructions for playing a specific electronic wagering game wherein at least one aspect of the claimed process could not be performed by the human mind (*i.e.*, determining the location of the mobile gaming device).[79]

68.    When the claims of Evolution's patents are viewed as a whole and considered in light of their specifications and prosecution histories, it is evident that they are directed to specific software advancements for new game elements, and not merely the rules for traditional wagering games or existing generic computer components carrying out rules for traditional wagering games.

69.    In traditional roulette games, whether live or electronic, a player places a bet on a number on a roulette board that corresponds to a position on a roulette wheel, the roulette wheel and ball are spun, and if the ball lands in the position that the player bet on, the player wins. In a straight-up bet scenario—where the player places a bet on a single number—if the ball lands on that number, the player is paid 35 times the bet (*i.e.*, a 35:1 payout).  In traditional roulette, players also may place several types of outside bets that have different odds (*e.g.*, that the ball will land on an even or odd number which pays 2:1), but these standard payouts from the roulette game has always been that straightforward.  That was the way roulette had been played for centuries. Fun, but not as exciting as what Evolution did to improve the game.

70.    In 2018, Evolution added features to the game, never before implemented by anyone, to drastically improve the players' experience.  For example, during a narrow window of time—after the spinning of the wheel and ball, but before the ball lands on a position— Evolution's software uses a random number generator to select a subset of the positions, and announces to the players that those positions will receive not the usual 35 times payout, but a

---

[78] *CG Tech. Dev., LLC v. Bwin.party (USA), Inc.*, No. 16-CV-00871, 2016 WL 6089696, at *1 (D. Nev. Oct. 18, 2016).

[79] *Id.* at *11–14.

different payout many multiples higher than the usual payout. The multipliers may be, for example, 50 times, 100 times, or 500 times. The selected positions change from game to game, and the multipliers change from game to game. These features significantly enhanced the excitement of the playing experience.

71. The industry's and players' response to Evolution's innovations was significant. In just a few years, Evolution's Lightning Roulette became the largest and most profitable roulette game in the world, and has generated hundreds of millions of euros in worldwide revenue. The industry voiced praise for Evolution's new game, awarding it Product Innovation of the Year at the 2018 Global Gaming Awards for being the "most revolutionary product in the last 12 months," Product Innovation of the Year at the 2018 Global Gaming Expo (G2E) for its "unsurpassed" "software contributions to the industry," Game of the Year at the 2018 EGR Operator Awards for "making the biggest annual impact," and Gaming Product of the Year at the 2022 American Gambling Awards for "set[ting] the standard" and "providing market-leading solutions for its partners."[80]

72. Like many revolutionary inventions, Evolution's inventions appear simple in hindsight. But the validity of Evolution's inventions "must be evaluated not from the perspective of the present day or with the benefit of hindsight but from the 'time of the patent.'"[81] "Experience has shown that some of the simplest advances have been the most nonobvious."[82] And despite their apparent simplicity, it took Evolution years to perfect these inventions.

---

[80] https://www.gamblinginsider.com/news/6039/global-gaming-awards-las-vegas-2018-winners-revealed; https://www.realmoneyaction.com/evolution-gaming-wins-product-innovation-of-the-year-at-g2e/; https://lcb.org/news/evolution-s-lightning-roulette-voted-goty-at-egr; https://www.businesswire.com/news/home/20221118005067/en/Lightning-Roulette-U.S.-from-Evolution-is-the-American-Gambling-Awards-Gaming-Product-of-the-Year.

[81] *Personalized Media Communs., LLC v. Netflix Inc*., 475 F. Supp. 3d 289, 297 (S.D.N.Y. 2020) (quoting *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367 (Fed. Cir. 2018)); *see also Ameritox, Ltd. v. Millennium Health, LLC*, 88 F. Supp. 3d 885, 914 (W.D. Wis. 2015) ("the concern of hindsight bias has as much relevance to a § 101 challenge as it does a § 103 challenge"); *see also, e.g.*, *Verint Sys. v. Red Box Recorders Ltd.*, 226 F. Supp. 3d 190, 198 (S.D.N.Y. 2016) (a claim that "initially appear[ed] to be a relatively simple method" was found patent eligible).

[82] *Demaco Corp. v. F. Von Langsdorff Licensing, Ltd*., 851 F.2d 1387, 1391 (Fed. Cir. 1988); *see also Coconut Grove Pads, Inc. v. Mich & Mich TGR, Inc*., 222 F. Supp. 3d 222, 249 (E.D.N.Y.

73.     Given the elegant simplicity of the innovations, it was critical for Evolution to obtain a robust portfolio of patents to protect its inventions from being blatantly copied by the industry.  The U.S. Patent Office, after rigorous examination of the prior art, granted Evolution a number of patents directed to these inventions.

74.     The Asserted Patents are each directed to technological improvements in existing technology for a new roulette game.  Each of the claims is unique, and is not representative of any other claim in the same patent or in any other patent owned by Evolution.  For example, Evolution has accused PowerX of infringing the '371 patent, but not the '024 and '014 patents. That is because the '014 and '024 patents includes different limitations that are distinct from what is claimed in the '371 patent.  As another example, Evolution is accusing both RouletteX and 88 Fortunes Blaze Live of infringing claim 1 of the '024 patent, but is accusing only RouletteX of infringing claims 2-3 of the '024 patent.  The Asserted Patents share the same specification but include different independent claims for systems, methods, and non-transitory computer-readable medium, as well as numerous dependent claims.

75.     For example, claim 8 of the '024 patent, shown below, claims (the relevant portions of the claim corresponding to the features described in the prior paragraphs are emphasized):

8. A system for wagering, comprising:

a roulette wheel;

a ball configured to be used in the roulette wheel;

a hardware processor configured to:

receive first bet information for a first bet from a first player device of a first player on a spin of the roulette wheel, the first bet information corresponding to at least a first position on the roulette wheel;

receive second bet information for a second bet from a second player device of a second player on the spin of the roulette wheel, the second bet

---

2016).

- 23 -

information corresponding to at least a second position on the roulette wheel that is different from the first position;

*determine that the roulette wheel and the ball have been spun* for the spin of the roulette wheel;

*randomly select a first selected position* on the roulette wheel for the spin of the roulette wheel *prior to the ball falling into a position on the roulette wheel*, wherein the first selected position is the same as the first position;

*determine a first payout for first position* and a second payout for the second position for the spin of the roulette wheel, *wherein the first payout is higher than the second payout*;

determine that the ball has fallen in the first position for the spin of the roulette wheel; and

indicating that the first player is to be paid at the first payout for the spin of the roulette wheel.

'024 patent, 8:9-36 (emphasis added); *see also id.* at 8:62-9:24; 9:46-10:24.

76. The Asserted Patents are directed to specific technological software improvements that embody innovations never before implemented in traditional roulette games, whether live or electronic. Those improvements include (1) facilitating unique features of a new and improved game of roulette such as the random selection of positions on the roulette wheel and associated increased payouts (multipliers) for those positions, (2) ensuring that the random selection of positions for multipliers takes place after the roulette wheel and ball have been spun, but before the ball has fallen in a position, and (3) enabling single or multiplayer participation through electronic player devices of the new and improved game.

77. *First*, the patents claim a new game of roulette and technological improvements that facilitate gameplay with the unique features of that new game. In the traditional table game of roulette, a player physically places a bet on a number (or grouping of numbers) that corresponds to a position on the roulette wheel by placing a chips on that number. If the ball lands in that position, a live dealer awards the player a standard payout of 35:1 by giving the player chips. The new and improved game of roulette in the Asserted Patents is different. For example,

unlike traditional roulette, in Evolution's new game, a single player or multiple players can play the game on electronic gaming terminals either in a casino or from a remote location. At the start of each game round, Evolution's innovative software allows players to place their bets electronically. Then, for each game round, in the narrow window of time after the wheel and ball have been spun and before the ball lands, the innovative game software uses an algorithm to randomly or pseudo-randomly select one or more positions on the roulette wheel to receive a multiplier for that round. *See, e.g.*, '024 patent, 9:10-19, 4:56-5:30. If a player electronically places a bet on a number corresponding to one of the randomly or pseudo-randomly selected positions, and if the ball falls into that position on the wheel, the game software determines an increased payout that is higher than the payout for positions without a multiplier, indicates that increased payout to the player on the player's device display, and makes the electronic payout to the player. *See, e.g.*, *id*.

78.    These novel and technological game features are narrowly tailored to implement Evolution's technological innovations, and do not unduly preempt the field for other innovations.

79.    These novel and technological game features also cannot be done in the human mind.

80.    Viewed as a whole, the claims of the Asserted Patents are directed to specific technological software improvements that facilitate gameplay with these novel features. For example, claim 1 of '024 patent recites software operations that include the specific steps of "randomly select[ing] a first selected position on the roulette wheel for the spin of the roulette wheel prior to the ball falling into a position on the roulette wheel, wherein the first selected position is the same as the first position;" "determin[ing] a first payout for first position and a second payout for the second position for the spin of the roulette wheel, wherein the first payout is higher than the second payout;" and "indicating that the first player is to be paid at the first payout for the spin of the roulette wheel." '024 patent, 8:24-32, 8:35-36.

81.    The Asserted Patents[83] further describe how the selected wheel positions and modified payouts are determined—and thus how these technological improvements work. The patents explain, for example, that the innovative "process for implementing a wagering game" "can randomly select one or more of the roulette wheel numbers" using "a pseudo-random number generator function." *See, e.g.*, *id*. at 4:31-32, 4:56-57, 4:59-60. And "pseudo-random functions can be used to approximate random functions and thereby select pseudo-random numbers, which can be considered to be random numbers." *See, e.g.*, *id*. at 4:61-65. The patents further explain that the process "can next determine the increased payouts for the numbers selected" and "[t]he payout for numbers not selected [] can be set to account for the increased payouts of the selected numbers." *See, e.g.*, *id*. at 5:12-13; 5:24-26. In other words, the standard payout from traditional roulette (35:1) can be decreased for numbers without multipliers in order to balance out the increased payouts for numbers with multipliers. This achieves better player engagement through the lure of potentially higher awards, while maintaining a reasonable house edge for game operators. As set forth in the patents, once the randomly or pseudo-randomly selected positions and increased payouts are determined, the process "can detect the ball dropping into a position on the roulette wheel, deduct bet money from player accounts . . . , and make payouts of money." *See, e.g.*, *id*. at 5:31-35.

82.    During prosecution of the '024 patent, the applicant also clarified how the patents' random selection of wheel positions and increased payouts is different from, and novel over, specific aspects of prior art that embodied the game rules of traditional roulette. Initially, the Examiner rejected the claims under 35 U.S.C. § 102 as being anticipated by U.S. Patent No. 9,600,974 (referred to as the "Yee" reference).[84] The applicant responded that, while "Yee discusses randomly generating a number, it clearly explains that this number would be the number corresponding to a position on a roulette wheel into which a ball drops. That is, the ball dropping

---

[83] References to and quotations from the specification throughout this Section are with respect to the shared specification for all three of the '024, '014, and '371 patents, and exemplary citations to the '024 patent are provided.

[84] U.S. Patent No. 10,629,024 File History, 6/28/2019 Office Action at 2.

into the position is the random generation of a number.  At no point does Yee show or suggest 'randomly select[ing] a first selected position on [a] roulette wheel for [a] spin of the roulette wheel prior to the ball falling into a position on the roulette wheel' as recited in claim 1."[85]  Put differently, just as in traditional roulette, Yee disclosed the act of the ball falling into a random position on the wheel to select a winning number, whereas Evolution's claimed inventions randomly select positions on the wheel to receive increased payouts prior to the ball dropping.  The Examiner agreed with this argument and allowed all the claims to issue.[86]

83.    *Second*, another technological improvement is enabling single or multiplayer participation through electronic player devices.  As explained in the '024, '014, and '371 patents, "[i]n traditional wagering, a player would have to travel to a casino to place wagers" and "traveling can be expensive and time consuming."  *See, e.g.*, '024 patent, 1:14-18.  The patents also recognized problems with existing Internet-based wagering systems, including that such systems "are simply computer-generated interfaces that do not replicate in any way a real environment like is present in a casino."  *See, e.g.*, *id.* at 1:19-25.  The Asserted Patents thus provide technological solutions to these problems that achieve improved systems and processes for playing the claimed new roulette game in remote, multiplayer, and (optionally) live gaming environments.

84.    The Asserted Patents explain that the first and second player devices "can present a user interface, video, and audio," and "can receive bets via the interface."  *See, e.g.*, *id.* at 4:15-18.  The Asserted Patents further explain how players can place wagers on player devices and how the wager information can be received for each player device.  The "[b]etting interface area," for example, can provide "user interface elements for wagering in the game."  *See, e.g.*, *id.* at 5:55-63.  Such user interface elements include "an account balance 306 and total bet amount 308 [] to show a player how much money the player has in the betting account and how much money the player is currently wagering."  *See, e.g.*, *id.*  "[T]he player can select a position on the

---

[85] *Id.* at 10/28/2019 Applicant Response at 10.

[86] *Id.*

roulette wheel on which to bet by selecting a virtual chip and selecting a desired place on the simulated roulette board." *See, e.g.*, *id.*

85.    *Third*, the independent claims of the '014 and '371 patents claim additional features and technological improvements.  For example, in addition to the limitations of claim 1 of the '024 patent shown above, independent claim 9 of the '014 patent also recites specific software steps for "generating, using at least one hardware processor, a first graphical user interface for presentation on a first player device of a first player" and "generating, using the at least one hardware processor, a second graphical user interface for presentation on a second player device of a second player." *See* '014 patent, 9:8-13; *see also id.* at 8:15-18, 10:8-11; *see also* '371 patent, 9:12-15.

86.    *Fourth*, the dependent claims likewise claim additional features and technological improvements.  For instance, claims 7, 14, and 20 of the '024 patent and claims 5, 13, and 21 of the '014 patent claim "randomly select[ing] a second selected position on the roulette wheel; and determin[ing] a payout for the second selected position that is different than the payout for the single first position."  '024 patent, 8:56-61, 9:41-45, 10:43-48; '014 patent, 8:56-61, 9:57-61, 10:49-54.  This is yet another difference with traditional roulette, as now two numbers on the wheel are randomly selected.  A multiplier is selected for one of the numbers that results in a higher payout, and a different multiplier is selected for the other number that results in an even higher payout.

87.    Along the same lines, claims 4, 14, and 24 of the '371 patent claim "randomly or pseudo-randomly select[ing] a second selected position of the plurality of positions on the roulette wheel to have a second increased payout for the spin of the roulette wheel prior to the ball landing into any of the plurality of positions on the roulette wheel for the spin, wherein the second increased payout for the second selected position is greater than a second non-selected payout that would have been applicable to a second bet on the second selected position for the spin had the second selected position not been selected by the randomly or pseudo-randomly selecting

the second selected position for the spin, and wherein the second increased payout is different than the first increased payout." '317 patent, 8:44-59, 9:37-50, 10:37-42.

88.    Other dependent claims include a wheel sensor.  Claims 2, 9, and 16 of the '024 patent, for example, claim using "a wheel sensor that is coupled to the hardware processor to determine that the roulette wheel has been spun." '024 patent, 8:37-40, 9:25-27, 10:25-27.  The "wheel sensor 104 can detect the spinning of the wheel and the position in which the ball falls" and that "the sensor can be implemented as a camera." *Id*. at 3:9-12.  As a further example, claims 7, 15, and 23 of the '014 patent and claims 6, 16, and 26 of the '371 patent claim presenting a "first graphical user interface [that] includes a roulette board" and highlighting the first selected position on the board in response to the first selected position being randomly selected.  '014 patent, 8:65-9:2, 9:64-67, 10:57-61; '371 patent, 8:63-67, 9:54-55, 10:46-51.  As another example, claims 6, 14, and 22 of the '014 patent and claims 5, 15, and 25 of the '371 patent claim "caus[ing] the ball and the roulette wheel to automatically spin." '014 patent, 8:63-65, 9:62-63, 10:54-56; '371 patent, 8:60-62, 9:51-52, 10:43-45.  And as another example, claims 3 and 10 of the '024 patent claim "clos[ing] bets when the roulette wheel and the ball are determined to have been spun." '024 patent, 8:41-43, 9:28-30.  The patent explains that "[o]nce bets are closed, players may be prevented from adding new bets, cancelling existing bets, and/or altering existing bets." *Id*. at 4:51-53.

89.    As the above shows, the claims of the Asserted Patents are patent eligible and similar to those upheld in *Skillz*.  There, the claims pertained to "specific implementations using pseudo-random number seeds to standardize gameplay in an electronic skills-based game."[87] Additionally, the "claims provide[d] specific steps for achieving [the claimed] result" of managing a wagering game: "(1) receiving a stream of pseudo-random number seeds; (2) receiving game data from the game server; (3) generating a plurality of pseudo-random numbers using the stream of pseudorandom number seeds; and (4) executing the game instance using the plurality of pseudo-

---

[87] *Skillz*, 2022 U.S. Dist. LEXIS 45187, at *26.

random numbers."[88]  Like the claims here, the claims in *Skillz*, "improve[d] how games are played in a computing environment."[89]  "Specifically, the use of a pseudo-random number to improve game play was sufficient to find the claims were not directed to an abstract idea."[90]  The same is true of the random number generator and the various other technological improvements in the '024, '014, and '371 patents.

90.    On the flip side, the claims of  the Asserted Patents are nothing like the claims found ineligible as directed to gaming-related abstract ideas in *In re Smith*, *Marco Guldenaar*, and *Planet Bingo*.[91]  As *Skillz* recognized, the claims in *In re Smith* and *Marco Guldenaar* "simply recited the rules of dice and wagering games."[92]  In *Planet Bingo*, the claims similarly recited a computerized version of a conventional pre-Internet bingo game, with steps that did no more than mimic the administration of a conventional bingo game, and, as a result, the claims were "merely drawn to implementing a generic bingo game" and thus directed to an abstract idea.[93]  In short, as *Skillz* summarized, there is "little similarity between claims that outline abstract rules for playing a game and the [] claims …, which pertain to specific steps for setting up common, randomized gameplay in a networked computing environment."[94]

91.    The claims of  the Asserted Patents are also not analogous to the claims found ineligible in *NEXRF Corp. v. Playtika Ltd*.[95]  In that case, five patents "generally claim[ed] slot machine games playable on a computer or handheld device run on a remote server."[96]  The

---

[88] *Id*. at *29–30.

[89] *Id*. at *31.

[90] *Vetnos*, 2024 U.S. Dist. LEXIS 68535, at *37 (discussing *Skillz*).

[91] *See In re Smith*, 815 F.3d 816 (Fed. Cir. 2016); *In re Marco Guldenaar Holding B.V.*, 911 F.3d 1157 (Fed. Cir. 2018); *Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005 (Fed. Cir. 2014).

[92] *Skillz*, 2022 U.S. Dist. LEXIS 45187, at *30; *see also Smith*, 815 F.3d at 818; *Marco Guldenaar Holding B.V.*, 911 F.3d at 1159.

[93] *Skillz*, 2022 U.S. Dist. LEXIS 45187, at *31; *Planet Bingo*, 576 F. App'x at 1007–08.

[94] *Skillz*, 2022 U.S. Dist. LEXIS 45187, at *31.

[95] 547 F. Supp. 3d 977 (D. Nev. 2021).

[96] *Id*. at 982.

court found the claims to be "directed to the abstract idea of remotely playing a slot machine on a server" and did not agree that the "centralized game server" was a "key inventive elements of all asserted patents."[97]  The court also noted that the patents did "not explain how any of the purported technological improvements work,"[98] because, for example, certain claims included "a paytable module that determines the prizes" but the patents did "not explain how the paytable module does that."[99]

92.    The claims of the Asserted Patents are different from the claims in these case.  The asserted patents do not just recite the rules of traditional roulette, like the claims in *In re Smith* and *Marco Guldenaar* did.  Nor are the claims directed to simply using an generic computer or server to carry out the conventional rules of roulette without technological improvements, like the claims in *Planet Bingo* and *NEXRF*.  Traditional roulette involves players physically placing bets on numbers that correspond to positions on the roulette wheel, with a live dealer awarding a standard payout of 35:1 for each position.  The payouts in traditional roulette are the exact same for all thirty-seven (single zero wheel) or thirty-eight (double zero wheel) positions on the wheel, and there are no increased payouts.  The new roulette game claimed in the '024, '014, and '371 patents, by contrast, includes a computerized process with innovative software that randomly assigns multipliers to certain positions on the roulette wheel.  When a player electronically places a bet on a position that has been assigned a multiplier by the game software and the ball lands in that position, the game software awards the player an increased payout, the exact amount of which is determined by the computerized process.  The positions on the wheel that receive multipliers and the size of the multipliers for each position are not static or set; what positions receive multipliers and the magnitude of the multipliers change each round of the game and are determined by the innovative game software.  *See, e.g.*, '024 patent, 8:12-36, 4:56-5:35, 4:31-39, 5:55-67, 6:23-29.

---

[97] *Id.* at 987–88.

[98] *Id.* at 988.

[99] *Id.*

93.     The claims of the Asserted Patents are also directed to specific technological software improvements that enable single or multiplayer participation through electronic player devices of this new and improved roulette game.  As explained by the patents:

> In traditional wagering, a player would have to travel to a casino to place wagers. While casinos are enjoyable, traveling to one can be expensive and time consuming. Internet-based wagering system allow players to wager from home without the need to travel to a casino. Unfortunately, however, many Internet-based wagering systems are simply computer-generated interfaces that do not replicate in any way a real environment like is present in a casino Accordingly, it is desirable to provide Internet-based wagering that replicates aspects of a real casino.

*E.g.*, *id*. at 1:15-25.  The patents' technological software improvements include improvements unique to the new game features of assigning multipliers and associated increased payouts to different positions on the wheel.  Unlike the patents in *NEXRF*, the asserted patents explain exactly how this is done—each round, the game software randomly or pseudo-randomly selects the positions on the wheel that receive multipliers and the increased payouts for those positions using, *e.g.*, a pseudo-random number generator.   Dependent claims then add more features and technological improvements, like using a wheel sensor that is coupled to the hardware processor "to determine that the roulette wheel has been spun" and when that determination is made, closing bets.

94.     The claimed inventions do not preempt the game of roulette or impede innovation in roulette technologies.  That is an animating concern behind Section 101—preventing a patent on ideas that preempts a broad field and "might tend to impede innovation more than it would tend to promote it, thereby thwarting the primary object of the patent laws."[100]  The claims may "embody, use, reflect, rest upon, or apply" the abstract idea of playing traditional roulette games, but they are not directed to any such abstract idea.[101]  Innovation can and has continued in

---

[100] *Alice*, 573 U.S. at 216 (internal citation omitted).

[101] *Id*. at 217 (internal citation omitted).

the world of wagering roulette games. Indeed, by contending that its RouletteX, PowerX, and 88 Fortunes Blaze Live Roulette games do not infringe the Asserted Patents, L&W implicitly agrees that the claimed inventions in the patents do not preempt or foreclose innovation on roulette games.

95.     Evolution's patents are directed to eligible subject matters. These U.S. patents stand guard over Evolution's important innovations and keep out copycat competitors. Without the ability to protect important inventions like Evolution's, the gaming industry would lose significant incentive for any market player to invest time and resources to innovate. Instead, it would breed copycats who lie in wait for other companies to release new features, and then rip off those new features as soon as they prove to be successful.

**Even if Directed to an Abstract Idea, The Asserted Patents Contain Inventive Concepts (*Alice* Step 2)**

96.     The Asserted Patents are patent eligible for the independent reason that they contain inventive concepts.

97.     When patent claims are found to be directed to patent ineligible concepts, the second step of the *Alice* inquiry asks whether those claims "contain[] an 'inventive concept' sufficient to transform" the ineligible concept "into a patent-eligible application."[102] "Under step two, claims that are directed to a patent-ineligible concept, yet also improve[] an existing technological process, are sufficient to transform[] the process into an inventive application."[103] "An inventive concept reflects something more than the application of an abstract idea using 'well-understood, routine, and conventional activities previously known to the industry.'"[104] "Whether the claim elements or the claimed combination are well-understood, routine, conventional is a question of fact."[105]

---

[102] *Alice*, 134 S. Ct. at 2357 (internal citation omitted).

[103] *Rapid Litig. Mgmt.*, 827 F.3d at 1050 (internal quotations omitted).

[104] *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1316 (Fed. Cir. 2019).

[105] *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018).

98.     Both the Federal Circuit and L&W understand that "not [] all inventions in the gaming arts [are] foreclosed from patent protection under § 101."  The Federal Circuit said as much in *Smith*, and explained that it "could envisage" "claims directed to conducting a game using [] ***new or original***" game elements "potentially surviving step two of *Alice*."[106]

99.     The step two inquiry involves "look[ing] to both the claim as a whole and the individual claim elements to determine whether the claims contain an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."[107]  Put differently, the inquiry "requires more than recognizing that each claim element, by itself, was known in the art."[108]  In that regard, as the Federal Circuit has explained, "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces."[109]

100.    The Federal Circuit's decision *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, illustrates this distinction.[110]  The claims were directed to the abstract idea of "filtering content on the Internet."[111]  The district court had focused on limitations involving steps on a "local client computer," "remote ISP server," "Internet computer network," and "controlled access network accounts," and held they were "no more than routine additional steps involving generic computer components and the Internet, which interact in well-known ways to accomplish the abstract idea."[112]  The Federal Circuit reversed.  While those components "taken individually, recite generic computer, network and Internet components," the Court found that the

---

[106] *In re Smith*, 815 F.3d at 819 (emphasis added).

[107] *McRO*, 837 F.3d at 1312 (internal quotations omitted).

[108] *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016).

[109] *Id.*

[110] 827 F.3d 1341 (Fed. Cir. 2016); *see also Timeplay, Inc. v. Audience Ent't*, No. 15-cv-5202, 2015 WL 9695321, at *8 (C.D. Cal. Nov. 10, 2015) (finding claims of a patent "designed to solve a problem particular to the realm of multi-player gaming" contained an inventive concept under *Alice* step 2).

[111] *BASCOM Glob.*, 827 F.3d at 1348.

[112] *Id.* at 1349.

"claims do not merely recite the abstract idea of filtering content along with the requirement to perform it on the Internet, or to perform it on a set of generic computer components."[113]  The claims did not "preempt all ways of filtering content on the Internet," but recited a "specific, discrete implementation of the abstract idea of filtering content."[114]

101.    Similarly, in *DDR Holdings, LLC v. Hotels.com, L.P.*, the Federal Circuit found the asserted patent "amount[ed] to an inventive concept for resolving this particular Internet-centric problem" where the claims "recite[d] a specific way to … solve a problem faced by websites on the Internet," (*i.e.*, losing visitor traffic when they click on third party advertisements are redirected to third party webpages), as opposed to "merely the routine or conventional use of the Internet."[115]  As a result, "the claims at issue d[id] not attempt to preempt every application of the idea of increasing sales by making two web pages look the same."[116]

102.    Likewise, the claims of the Asserted Patents contain do not preempt all ways of playing roulette, but recite specific, discrete software implementations of playing a new game of roulette.  Even L&W acknowledges so.

103.    The claims of the Asserted Patents contain inventive concepts and are patent eligible.  The claims are analogous to the claims found patent eligible in *BASCOM* and claim significantly more than just playing the traditional game of roulette.  Here, as in *BASCOM*, although the claims include a generic "hardware processor," they do not merely recite playing traditional roulette using the hardware processor and nothing more.  Unlike the claims in *NEXRF*, moreover, the claims here do not simply "consist[] of a combination of generic computer elements performing conventional functions."[117]  Instead, they recite systems and processes that are a specific, discrete implementation of a new and improved wagering roulette game, meaningfully

---

[113] *Id*. at 1349–50.

[114] *Id*. at 1350

[115] 773 F.3d at 1259.

[116] *Id*.

[117] *NEXRF*, 547 F. Supp. 3d at 989.

distinct from traditional roulette, in an inventive application. The inventive concepts described and claimed in these patents include, for example, software steps for using, *e.g.*, a pseudo-random number generator, to randomly select one or more of the roulette wheel numbers, and determine the increased payouts for those randomly selected numbers.

104.    The inventions of the Asserted Patents were also a novel advancement over the prior art. At the time of the invention, conventional table roulette games did not have randomly selected positions on a roulette wheel and associated increased payouts, both of which changed each round of the game. Traditional roulette also did not have any computerized system or process for facilitating such novel game features including through the use of a pseudo-random number generator.[118]

105.    These inventive concepts were not well-understood, routine, or conventional at the time of invention. To the contrary, as described above, others in the industry recognized the inventiveness of this new and enhanced game of roulette, and Evolution's commercial embodiment of the claimed game received several prestigious awards including, among others, Product Innovation of the Year at the 2018 Global Gaming Awards, Product Innovation of the Year at the 2018 Global Gaming Expo (G2E). Even L&W personnel recognized the game's uniqueness: a senior executive called it a "a truly unique roulette experience for players" and predicted that, with its "big-win multipliers, [the game] is sure to be one of the most visually engaging and entertaining live table games ever offered."[119] These objective metrics from the gaming industry—including from L&W—demonstrate that Evolution's Lightning Roulette game contains substantial and specific innovations.

106.    The USPTO's findings during prosecution of the '024 patent provide further evidence of the inventive concept and its novelty over prior art.[120] The Examiner initially rejected the claims of the '024 patent (parent and grandparent patent to the '014 and '371 patents,

---

[118] *See supra* ¶¶ 68–73, 76–93.

[119] *See supra* ¶¶ 13–22.

[120] *See supra* ¶ 82.

respectively) as anticipated by a prior art patent Yee, titled "Methods of Administering Roulette Bonus Wagers and Related Apparatuses and Systems."[121]  But, after hearing that Yee's disclosure of the ball falling into a random position on the wheel to select a winning number (the conventional means of determining a winning number in traditional roulette) is *not* the same as claimed innovation of randomly selecting positions on the wheel to receive increased payouts, the Examiner agreed and allowed all the claims to issue.[122]  That further shows that the patents' inventive concepts were not well-understood, routine, or conventional.

107.    In addition, L&W's own statements confirm eligibility.  In talking about their own patents, L&W says that a "'new or original' blackjack table" is patent eligible.[123]  That is exactly what the claims of the Asserted Patents recite here—Evolution developed a "new [and] original" game of roulette, and the claims of these patents are directed to technological improvements in existing technology for facilitating this new roulette game and include "new [and] original" game elements, such as the random selection of one or more wheel numbers and increased payouts for those randomly selected numbers.

## FIRST CAUSE OF ACTION

## (Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836)

108.    Evolution realleges and incorporates by reference the allegations contained in paragraphs 0–107 as though fully set forth herein.

109.    Evolution is the owner of trade secrets.  As a result of the NDA, Heads of Terms, and pursuant to the Agreement, L&W obtained Evolution's intellectual property, including Evolution's proprietary work product, processes, formulae, trade secrets, and know-how or similar rights.  At minimum, the proprietary math files described above in paragraphs 30–31 above

---

[121] U.S. Patent No. 10,629,024 File History, 6/28/2019 Office Action at 2.

[122] *Id*. at 10/28/2019 Applicant Response at 10; 12/16/2019 Notice of Allowance.

[123] ECF No. 66 at 5, n.5.

1    constitute Evolution's trade secrets subject to protection under the Defend Trade Secrets Act, 18

2    U.S.C. § 1836.

3              110.    Evolution's trade secrets, as described above, relate to a product or service

4    used in, or intended for use in, interstate or foreign commerce.  Specifically, these trade secrets are

5    used in Evolution's online live version of Lightning Roulette, which is available online throughout

6    the world, including in the United States.  In addition, these trade secrets were intended for use in

7    physical Lightning Roulette game tables, such as those that LNW Gaming had agreed to produce

8    pursuant to the Agreement, in land-based casinos throughout the world, including in the United

9    States.  Upon information and belief, L&W has improperly used Evolution's trade secrets, without

10   authorization, in RouletteX and/or PowerX products that L&W has offered to sell and/or sold in

11   the United States and overseas in at least Europe (*e.g.*, Finland and United Kingdom) and Asia.[124]

---

[124]  *See, e.g.,*  https://www.linkedin.com/posts/scientific-games-gaming_roulettex-etg-activity-6884235953263783936-Nrw7;  https://explore.lnw.com/newsroom/light-wonder-builds-new-worlds-of-play-at-g2e-asia-in-singapore/ ("Light & Wonder also will feature one of its premier ETG experiences, ***RouletteX*™**."); https://www.ggrasia.com/a-jin-ji-bao-xi-grand-entrance-from-light-wonder/ ("[T]he group's clients in Asia Pacific could look forward to the introduction of RouletteX, which gives players the chance to win up to 500 times the value of their wager on a single number.").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27



1

2

3

4

5

6

7

8

9

10

11

12

13

14



15     111.     Evolution's trade secret information derives independent economic value

16    from not being generally known to and not being readily ascertainable through proper means by

17    the public or other persons who could obtain value from its disclosure or use.  For example, as

18    explained above, the Lightning Roulette math files allow, among other things, the Lightning

19    Roulette game to remain profitable despite the inclusion of multipliers with increased payouts and

20    increases player engagement with the game.  Indeed, Lightning Roulette's resounding success is

21    attributable, at least in part, to these math files.  Evolution's trade secrets are limited in their

22    distribution within Evolution, only disclosed to third parties under strict confidentiality and/or non-

23    disclosure agreements, and not readily available to the public or to Evolution's competitors.

24     112.     Evolution     has     taken     more     than     reasonable     measures     under     the

25    circumstances to maintain the secrecy of its trade secret information, including marking such

26    information with a "COMPANY CONFIDENTIAL" stamp or other indication of secrecy in a

27

reasonably noticeable manner, limiting internal access to such information at Evolution, protecting against impermissible dissemination of the information, requiring passwords to be used to access computer systems and records, and requiring employees to sign confidentiality agreements. Evolution also had and has policies and procedures in place to protect its trade secret information.

113.     Under the terms of the NDA, LNW Gaming agreed to maintain the confidentiality of Evolution's trade secrets and use that information solely to the extent necessary for evaluating a business opportunity to develop a land-based version of Lightning Roulette.  In the Heads of Terms, LNW Gaming confirmed that it would not use Evolution's trade secrets for any purpose other than to perform its obligations under the Heads of Terms.  In addition, in the Agreement, LNW Gaming again confirmed its agreement to "hold all confidential information of [Evolution], including without limitation, any information relating to [Evolution's] business operations and all other information disclosed by [Evolution] . . . in strict confidence and not to use any of the foregoing commercially for its own benefit or that of anyone else."  LNW Gaming further agreed not to disseminate or provide access to Evolution's confidential information to anyone, other than those who have expressly been approved by Evolution and who have entered into an agreement that would also prohibit their unauthorized use of Evolution's confidential information.  The Agreement further provided that Evolution's disclosure of confidential and proprietary information to LNW Gaming shall not be construed as a grant of any rights in or license to that information.  The Agreement further expressly prohibited LNW Gaming from using Evolution's intellectual property to create physical table games that would compete with a physical Lightning Roulette game table.  Accordingly, LNW Gaming had a duty to maintain the secrecy of Evolution's trade secrets and had no expectation that it would be authorized to utilize Evolution's trade secrets for its or anyone else's benefit.

114.     Evolution has spent significant time, skill, research and development to develop and maintain its trade secrets, which are extremely valuable to Evolution, give Evolution a competitive advantage, and would be of great value to a competitor.

115.    In reliance on the confidentiality terms of the NDA, Heads of Term, and Agreement, Evolution provided LNW Gaming with access to its trade secrets for the sole purpose of developing physical Lightning Roulette game tables for land-based casinos.

116.    Rather than use Evolution's trade secrets for purposes of developing the agreed physical Lighting Roulette game tables, LNW Gaming (together with Light & Wonder, which as LNW Gaming's parent company was aware that LNW Gaming was not authorized to use Evolution's trade secrets for any purpose other than to develop the physical Lightning Roulette game tables) improperly used Evolution's trade secrets, without authorization, to develop RouletteX and PowerX, its own copycat roulette games for land-based casinos.  L&W's use of Evolution's trade secrets for its own benefit violates the Defend Trade Secrets Act, 18 U.S.C. § 1836.

117.    Evolution first discovered that L&W had misappropriated Evolution's trade secrets when L&W unilaterally sought to terminate the parties' Agreement in August 2021 and Evolution learned that L&W had launched a copycat game—RouletteX—that has strikingly similar appearance, features, and functionality as Evolution's Lightning Roulette.

118.    Evolution faces an immediate threat of irreparable harm, for which Evolution lacks an adequate remedy at law, for L&W's misappropriation and misuse of Evolution's trade secret information, including, but not limited to, reputational harm, loss of future business, and the potential that Evolution's trade secrets may be disseminated (*e.g.*, to L&W's contractors) beyond the Court's ability to provide monetary redress.

119.    Unless L&W is enjoined from the foregoing conduct, Evolution will be irreparably harmed by:

   (a)    Disclosure of trade secrets and other confidential information that is the property of Evolution;

   (b)    Loss of competitive advantage, loss of goodwill, lost compensation, and loss of business reputation; and

   (c)    Potential future economic loss, which is presently incalculable.

120.    As alleged herein, L&W's conduct has been and is malicious, deliberate, and willful.  LNW Gaming induced Evolution into providing L&W with Evolution's trade secrets for Lightning Roulette—Evolution's highly successful flagship product—under the auspices of entering into a partnership for developing physical Lightning Roulette game tables, but turned around and used those trade secrets to develop its own copycat products knowing that its acts would harm Evolution.  Evolution is therefore entitled to recover from L&W exemplary damages in an amount twice the total of the damages record for actual loss and/or unjust enrichment as permitted by 18 U.S.C. § 1836(b)(3)(C).

121.    Evolution is entitled to an award of attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

## SECOND CAUSE OF ACTION

### (Misappropriation of Trade Secrets in Violation of the Nevada Trade Secrets (Uniform Act), NRS 600A)

122.    Evolution realleges and incorporates by reference the allegations contained in paragraphs 0–121 as though fully set forth herein.

123.    L&W's actions, as set forth above, constitute trade secret misappropriation under Nevada law.

124.    Evolution is the owner of trade secrets.  As a result of the NDA, Heads of Terms, and pursuant to the Agreement, LNW Gaming obtained Evolution's intellectual property, including Evolution's proprietary work product, processes, formulae, trade secrets, and know-how or similar rights.  At minimum, the proprietary math files described above in paragraphs 30–31 constitute Evolution's trade secrets subject to protection under Nevada law.

125.    Evolution's trade secret information derives independent economic value from not being generally known to and not being readily ascertainable by proper means by the public or other persons who could obtain value from its disclosure or use.  For example, as explained above, the Lightning Roulette math files allow, among other things, the Lightning Roulette game to remain profitable despite the inclusion of multipliers with increased payouts and

increases player engagement with the game. Indeed, Lightning Roulette's resounding success is attributable, at least in part, to these math files. Evolution's trade secrets are limited in their distribution within Evolution, only disclosed to third parties under strict confidentiality and/or non-disclosure agreements, and not readily available to the public or to Evolution's competitors.

126. Evolution has taken more than reasonable measures under the circumstances to maintain the secrecy of its trade secret information, including marking such information with a "COMPANY CONFIDENTIAL" stamp or other indication of secrecy in a reasonably noticeable manner, limiting internal access to such information at Evolution, protecting against impermissible dissemination of the information, requiring passwords to be used to access computer systems and records, and requiring employees to sign confidentiality agreements. Evolution also had and has policies and procedures in place to protect its trade secret information.

127. Under the terms of the NDA, LNW Gaming agreed to maintain the confidentiality of Evolution's trade secrets and use that information solely to the extent necessary for evaluating a business opportunity to develop a land-based version of Lightning Roulette. In the Heads of Terms, LNW Gaming confirmed that it would not use Evolution's trade secrets for any purpose other than to perform its obligations under the Heads of Terms. In addition, in the Agreement, LNW Gaming again confirmed its agreement to "hold all confidential information of [Evolution], including without limitation, any information relating to [Evolution's] business operations and all other information disclosed by [Evolution] . . . in strict confidence and not to use any of the foregoing commercially for its own benefit or that of anyone else." LNW Gaming further agreed not to disseminate or provide access to Evolution's confidential information to anyone, other than those who have expressly been approved by Evolution and who have entered into an agreement that would also prohibit their unauthorized use of Evolution's confidential information. The Agreement further provided that Evolution's disclosure of confidential and proprietary information to LNW Gaming shall not be construed as a grant of any rights in or license to that information. The Agreement further expressly prohibited LNW Gaming from using Evolution's intellectual property to create physical table games that would compete with a physical

Lightning Roulette game table. Accordingly, LNW Gaming had a duty to maintain the secrecy of Evolution's trade secrets and had no expectation that it would be authorized to utilize Evolution's trade secrets for its or anyone else's benefit.

128. Evolution has spent significant time, skill, research and development to develop and maintain its trade secrets, which are extremely valuable to Evolution, give Evolution a competitive advantage, and would be of great value to a competitor.

129. In reliance on the terms of the NDA, Heads of Terms, and Agreement, Evolution provided LNW Gaming with access to its trade secrets for the sole purpose of developing physical Lightning Roulette game tables for land-based casinos.

130. Rather than use Evolution's trade secrets for purposes of developing the agreed physical Lighting Roulette game tables, LNW Gaming (together with Light & Wonder, which as LNW Gaming's parent company was aware that LNW Gaming was not authorized to use Evolution's trade secrets for any purpose other than to develop the physical Lightning Roulette game tables) improperly used Evolution's trade secrets, without authorization, to develop RouletteX and PowerX, its own copycat roulette games for land-based casinos. L&W's use of Evolution's trade secrets for its own benefit violates Nevada law.

131. Evolution first discovered that L&W had misappropriated Evolution's trade secrets when L&W unilaterally sought to terminate the parties' Agreement in August 2021 and Evolution learned that L&W had launched a copycat game—RouletteX—that has strikingly similar appearance, features, and functionality as Evolution's Lightning Roulette.

132. Evolution faces an immediate threat of irreparable harm, for which Evolution lacks an adequate remedy at law, for L&W's misappropriation and misuse of Evolution's trade secret information, including, but not limited to, reputational harm, loss of future business, and the potential that Evolution's trade secrets may be disseminated (*e.g.*, to L&W's contractors) beyond the Court's ability to provide monetary redress.

133. Unless L&W is enjoined from the foregoing conduct, Evolution will be irreparably harmed by:

(d)    Disclosure of trade secrets and other confidential information that is the property of Evolution;

(e)    Loss of competitive advantage, loss of goodwill, lost compensation, and loss of business reputation; and

(f)    Potential future economic loss, which is presently incalculable.

134.    As alleged herein, L&W's conduct has been and is willful, wanton, and/or reckless. LNW Gaming induced Evolution into providing L&W with Evolution's trade secrets for Lightning Roulette—Evolution's highly successful flagship product—under the auspices of entering into a partnership for developing physical Lightning Roulette game tables, but turned around and used those trade secrets to develop its own product, RouletteX and PowerX, knowing that its acts would harm Evolution. Evolution is therefore entitled to recover from L&W exemplary damages in an amount twice the total of the damages record for actual loss and/or unjust enrichment as permitted under NRS 600A.050.

135.    Evolution is entitled to an award of attorneys' fees pursuant to NRS 600A.060.

## THIRD CAUSE OF ACTION

### (Infringement of U.S. Patent No. 10,629,024)

136.    Evolution realleges and incorporates by reference the allegations contained in paragraphs 0–135 as though fully set forth herein.

137.    L&W has infringed and continues to infringe one or more claims of the '024 patent, literally or under the doctrine of equivalents, including, without limitation, claims 1–5, 7–12, 14–18, and 20 in violation of 35 U.S.C. § 271(a) by manufacturing, using, importing, selling, and/or offering to sell in the United States at least its RouletteX and 88 Fortunes Blaze Live Roulette systems. None of the claims are representative of any other claim in the '024 patent or in any other patent owned by Evolution. For example, Evolution has accused PowerX of infringing the '371 patent, but not the '024 and '014 patents. That is because the '014 and '024 patents includes different limitations that are distinct from what is claimed in the '371 patent. As another

example, Evolution is accusing both RouletteX and 88 Fortunes Blaze Live of infringing claim 1 of the '024 patent, but is accusing only RouletteX of infringing claims 2-3 of the '024 patent.

138.    For example, claim 1 of the '024 patent recites:

(g)    A system for wagering, comprising:

(h)    a roulette wheel;

(i)    a ball configured to be used in the roulette wheel;

(j)    a hardware processor configured to:

(k)    receive first bet information for a first bet from a first player device of a first player on a spin of the roulette wheel, the first bet information corresponding to at least a first position on the roulette wheel;

(l)    receive second bet information for a second bet from a second player device of a second player on the spin of the roulette wheel, the second bet information corresponding to at least a second position on the roulette wheel that is different from the first position;

(m)    determine that the roulette wheel and the ball have been spun for the spin of the roulette wheel;

(n)    randomly select a first selected position on the roulette wheel for the spin of the roulette wheel prior to the ball falling into a position on the roulette wheel, wherein the first selected position is the same as the first position;

(o)    determine a first payout for first position and a second payout for the second position for the spin of the roulette wheel, wherein the first payout is higher than the second payout;

(p)    determine that the ball has fallen in the first position for the spin of the roulette wheel; and

(q)    indicating that the first player is to be paid at the first payout for the spin of the roulette wheel.

139.    To the extent the preamble of claim 1 is considered a limitation, each of at least RouletteX and 88 Fortunes Blaze Live Roulette comprises a system for wagering. Additional information is set forth in Exhibit 2 at claim 1(a).

140.     Each of at least RouletteX and 88 Fortunes Blaze Live Roulette comprises a roulette wheel.  Additional information is set forth in Exhibit 2 at claim 1(b).

141.     Each of at least RouletteX and 88 Fortunes Blaze Live Roulette comprises a ball configured to be used in the roulette wheel.  Additional information is set forth in Exhibit 2 at claim 1(c).

142.     Each of at least RouletteX and 88 Fortunes Blaze Live Roulette comprises a hardware processor.  Additional information is set forth in Exhibit 2 at claim 1(d).

143.     Each of at least RouletteX and 88 Fortunes Blaze Live Roulette comprises a hardware processor configured to receive first bet information for a first bet from a first player device of a first player on a spin of the roulette wheel, the first bet information corresponding to at least a first position on the roulette wheel.  Additional information is set forth in Exhibit 2 at claim 1(e).

144.     Each of at least RouletteX and 88 Fortunes Blaze Live Roulette comprises a hardware processor configured to receive second bet information for a second bet from a second player device of a second player on the spin of the roulette wheel, the second bet information corresponding to at least a second position on the roulette wheel that is different from the first position.  Additional information is set forth in Exhibit 2 at claim 1(f).

145.     Each of at least RouletteX and 88 Fortunes Blaze Live Roulette comprises a hardware processor configured to determine that the roulette wheel and the ball have been spun for the spin of the roulette wheel.  Additional information is set forth in Exhibit 2 at claim 1(g).

146.     Each of at least RouletteX and 88 Fortunes Blaze Live Roulette comprise a hardware processor configured to randomly select a first selected position on the roulette wheel for the spin of the roulette wheel prior to the ball falling into a position on the roulette wheel, wherein the first selected position is the same as the first position.  Additional information is set forth in Exhibit 2 at claim 1(h).

147.     Each of at least RouletteX and 88 Fortunes Blaze Live Roulette comprises a hardware processor configured to determine a first payout for first position and a second payout

for the second position for the spin of the roulette wheel, wherein the first payout is higher than the second payout. Additional information is set forth in Exhibit 2 at claim 1(i).

148.    Each of at least RouletteX and 88 Fortunes Blaze Live Roulette comprises a hardware processor configured to determine that the ball has fallen in the first position for the spin of the roulette wheel. Additional information is set forth in Exhibit 2 at claim 1(j).

149.    Each of at least RouletteX and 88 Fortunes Blaze Live Roulette comprises a hardware processor configured to indicate that the first player is to be paid at the first payout for the spin of the roulette wheel. Additional information is set forth in Exhibit 2 at claim 1(k).

150.    L&W has had actual knowledge of the '024 patent since at least August 26, 2020.[125]

151.    Upon information and belief, L&W then used the '024 patent and Lightning Roulette as blueprints in developing its own copycat game, RouletteX, and thus knew that RouletteX would infringe one or more claims of the '024 patent. In view of at least L&W's actual knowledge of the '024 patent, L&W's knowledge that Lightning Roulette embodies the '024 patent, and the substantial similarities between Lightning Roulette and RouletteX, L&W deliberately and intentionally infringed the '024 patent. At the very least, L&W knew, based on the foregoing, that there was a high probability that RouletteX would infringe one or more claims of the '024 patent, but took deliberate steps to avoid learning of that infringement.

152.    In addition, by letters dated February 28, 2022, April 24, 2024, March 14, 2025, Evolution thrice put L&W on notice that RouletteX infringes the '024 patent and included explanation and citations to evidence showing how RouletteX infringes. L&W's continued infringement of the '024 patent, despite Evolution's notice, is deliberate and intentional.

153.    Evolution also, by letter dated March 14, 2025, put L&W on notice that 88 Fortunes Blaze Live Roulette infringes the '024 patent and provided explanation and citations to evidence, including in chart form, showing how 88 Fortunes Blaze Live Roulette infringes.

---

[125] *See* L&W Oct. 7, 2024 Resp. to Evol. Interrogatory No. 1.

L&W's continued infringement of the '024 patent, despite Evolution's notice and despite L&W's knowledge of this pending lawsuit when it decided to promote and launch 88 Fortunes Blaze Live Roulette, is deliberate and intentional.

154.    On information and belief, L&W has intentionally instructed, and will intentionally instruct, others, including casinos, game operators, and players, to use RouletteX and 88 Fortunes Blaze Live Roulette in a manner that infringes the '024 patent, literally or under the doctrine of equivalents.  For example, as is typical in the gaming industry, L&W directly advertises RouletteX and 88 Fortunes Blaze Live Roulette to casinos and game operators to encourage them to offer RouletteX and 88 Fortunes Blaze Live Roulette in their casinos.  For example, L&W promoted RouletteX in 2021, 2022, 2023, and 2024 and 88 Fortunes Blaze Live Roulette in 2024 at the Global Gaming Expo, which is held annually in Las Vegas, Nevada.[126]  The Global Gaming Expo is widely attended by the global gaming community, including representatives from casinos and gaming operators, and used by vendors, including L&W, to promote their products.  And, in fact, casinos are offering RouletteX on their floors for players to use and thus directly infringe the '024 patent.[127]  Additionally, L&W broadcasts 88 Fortunes Blaze Live Roulette from its studios in Michigan and/or elsewhere in the United States for players to use and thus directly infringe the '024 patent.[128]  L&W knows or has been willfully blind to the fact that such actions are inducing, and will induce, infringement.  The foregoing actions by L&W constitute, and will constitute, induced infringement of one or more claims of the '024 patent in violation of 35 U.S.C. § 271(b).

---

[126] *See* https://explore.lnw.com/newsroom/scientific-games-is-driving-the-future-of-gaming/ (2021); *see also* https://www.youtube.com/watch?v=7e22FFSWTac (2022); https://www.youtube.com/watch?v=B9sGivHKgiA (2023); https://www.youtube.com/watch?v=AItaRI6iaCo (2024).

[127] *See, e.g.*, https://www.linkedin.com/posts/lightnwonder_youre-looking-at-the-very-first-install-activity-704369269509292244416-kS6u?utm_source=share&utm_medium=member_desktop.

[128] *See* https://explore.lnw.com/newsroom/light-wonder-premium-live-dealer-by-authentic-gaming-goes-live-with-betrivers-in-landmark-u-s-launch/; https://www.linkedin.com/posts/lnw-live_88fortuneslive-livecasino-fortunatenewyear-activity-7279830021098098689-Ej2e/?utm_source=share&utm_medium=member_desktop.

155.    Upon information and belief, L&W has supplied and continues to supply from the United States all or a substantial portion of its infringing RouletteX system and has induced and continues to induce the combination of such components outside of the United States in a manner that would infringe the '024 patent if it occurred within the United States.  Upon information and belief, L&W has exported the infringing RouletteX system from the United States to at least Europe and Asia. [129]  For example, L&W (then, Scientific Games) announced through its LinkedIn page that its RouletteX game terminals are live in Finland and the UK, and encouraged customers to contact their L&W sales representatives:



---

[129] *See e.g.*, https://explore.lnw.com/newsroom/light-wonder-builds-new-worlds-of-play-at-g2e-asia-in-singapore/ ("Light & Wonder also will feature one of its premier ETG experiences, *RouletteX*™."); https://www.ggrasia.com/a-jin-ji-bao-xi-grand-entrance-from-light-wonder/ ("[T]he group's clients in Asia Pacific could look forward to the introduction of RouletteX, which gives players the chance to win up to 500 times the value of their wager on a single number.").

The foregoing actions by L&W constitute infringement of one or more claims of the '024 patent in violation of 35 U.S.C. § 271(f).

156.    L&W's infringement is without the consent or other authority of Evolution. L&W's license to the '024 patent was limited to building a physical Lightning Roulette game table.

157.    L&W's actions are willful and deliberate, and render this an exceptional case under 35 U.S.C. § 285.

158.    Evolution has been damaged by L&W's acts in an amount as yet unknown. Evolution has no adequate legal remedy.  Unless enjoined by this Court, L&W's continued acts of infringement will cause Evolution substantial and irreparable harm.  Under 35 U.S.C. § 283, Evolution is entitled to an injunction barring L&W from further infringement of the '024 patent.

## FOURTH CAUSE OF ACTION

### (Infringement of U.S. Patent No. 11,011,014)

159.    Evolution realleges and incorporates by reference the allegations contained in paragraphs 0–158 as though fully set forth herein.

160.    L&W has infringed and continues to infringe one or more claims of the '014 patent, literally or under the doctrine of equivalents, including, without limitation, claims 1–3, 5–11, 13–19, and 21–24 in violation of 35 U.S.C. § 271(a) by manufacturing, using, importing, selling, and/or offering to sell in the United States at least its RouletteX and 88 Fortunes Blaze Live Roulette systems.  None of the claims are representative of any other claim in the '014 patent or in any other patent owned by Evolution.  For example, Evolution has accused PowerX of infringing the '371 patent, but not the '024 and '014 patents.  That is because the '014 and '024 patents includes different limitations that are distinct from what is claimed in the '371 patent.  As another example, Evolution is accusing both RouletteX and 88 Fortunes Blaze Live of infringing claim 1 of the '014 patent, but is accusing only RouletteX of infringing claim 6 of the '014 patent.

161.    For example, claim 1 of the '014 patent recites:

(a)    A system for wagering, comprising:

(b)    a roulette wheel;

(c)    a ball configured to be used in the roulette wheel;

(d)    at least one hardware processor collectively configured to:

(e)    generate a first graphical user interface for presentation on a first player device of a first player;

(f)    generate a second graphical user interface for presentation on a second player device of a second player;

(g)    receive first bet information for a first bet on a spin of the roulette wheel via the first graphical user interface, the first bet information corresponding to only a single first position on the roulette wheel;

(h)    receive second bet information for a second bet on the spin of the roulette wheel via the second graphical user interface, the second bet information corresponding to only a single second position on the roulette wheel that is different from the single first position;

(i)    determine that the roulette wheel and the ball have been spun for the spin of the roulette wheel;

(j)    randomly select a first selected position on the roulette wheel for the spin of the roulette wheel prior to the ball falling into an outcome position on the roulette wheel, wherein the first selected position is the same as the single first position;

(k)    determine a first payout for the first single position and a second payout for the single second position for the spin of the roulette wheel, wherein the first payout is higher than the second payout;

(l)    determine that the ball has fallen in the single first position for the spin of the roulette wheel; and

(m)    indicate that the first player is to be paid at the first payout for the spin of the roulette wheel.

162.    To the extent the preamble of claim 1 is considered a limitation, each of at least RouletteX and 88 Fortunes Blaze Live Roulette comprises a system for wagering. Additional information is set forth in Exhibit 4 at claim 1(a).

163.    Each of at least RouletteX and 88 Fortunes Blaze Live Roulette comprises a roulette wheel. Additional information is set forth in Exhibit 4 at claim 1(b).

164.    Each of at least RouletteX and 88 Fortunes Blaze Live Roulette comprises a ball configured to be used in the roulette wheel.  Additional information is set forth in Exhibit 4 at claim 1(c).

165.    Each of at least RouletteX and 88 Fortunes Blaze Live Roulette comprises at least one hardware processor.  Additional information is set forth in Exhibit 4 at claim 1(d).

166.    Each of at least RouletteX and 88 Fortunes Blaze Live Roulette comprises at least one hardware processor collectively configured to generate a first graphical user interface for presentation on a first player device of a first player.  Additional information is set forth in Exhibit 4 at claim 1(e).

167.    Each of at least RouletteX and 88 Fortunes Blaze Live Roulette comprises at least one hardware processor collectively configured to generate a second graphical user interface for presentation on a second player device of a second player.  Additional information is set forth in Exhibit 4 at claim 1(f).

168.    Each of at least RouletteX and 88 Fortunes Blaze Live Roulette comprises at least one hardware processor collectively configured to receive first bet information for a first bet on a spin of the roulette wheel via the first graphical user interface, the first bet information corresponding to only a single first position on the roulette wheel.  Additional information is set forth in Exhibit 4 at claim 1(g).

169.    Each of at least RouletteX and 88 Fortunes Blaze Live Roulette comprises at least one hardware processor collectively configured to receive second bet information for a second bet on the spin of the roulette wheel via the second graphical user interface, the second bet information corresponding to only a single second position on the roulette wheel that is different from the single first position.  Additional information is set forth in Exhibit 4 at claim 1(h).

170.    Each of at least RouletteX and 88 Fortunes Blaze Live Roulette comprises at least one hardware processor collectively configured to determine that the roulette wheel and the ball have been spun for the spin of the roulette wheel.  Additional information is set forth in Exhibit 4 at claim 1(i).

171.    Each of at least RouletteX and 88 Fortunes Blaze Live Roulette comprises at least one hardware processor collectively configured to randomly select a first selected position on the roulette wheel for the spin of the roulette wheel prior to the ball falling into an outcome position on the roulette wheel, wherein the first selected position is the same as the single first position.  Additional information is set forth in Exhibit 4 at claim 1(j).

172.    Each of at least RouletteX and 88 Fortunes Blaze Live Roulette comprises at least one hardware processor collectively configured to determine a first payout for the first single position and a second payout for the single second position for the spin of the roulette wheel, wherein the first payout is higher than the second payout.  Additional information is set forth in Exhibit 4 at claim 1(k).

173.    Each of at least RouletteX and 88 Fortunes Blaze Live Roulette comprises at least one hardware processor collectively configured to determine that the ball has fallen in the single first position for the spin of the roulette wheel.  Additional information is set forth in Exhibit 4 at claim 1(l).

174.    Each of at least RouletteX and 88 Fortunes Blaze Live Roulette comprises at least one hardware processor collectively configured to indicate that the first player is to be paid at the first payout for the spin of the roulette wheel. Additional information is set forth in Exhibit 4 at claim 1(m).

175.    L&W has had actual knowledge of the '014 patent since at least March 8, 2021, as the patent application that led to the '014 patent—U.S. Patent App. No. 16/852,049—and its parent patent, the '024 patent, were expressly identified in the parties' Heads of Terms as intellectual property that protects Evolution's Lightning Roulette.[130]  That patent application and parent '024 patent are also specifically identified in the parties' March 29, 2021 Agreement.

176.    Upon information and belief, L&W then used the '014 patent and Lightning Roulette as blueprints in developing its own copycat game, RouletteX, and thus knew that

---

[130] *See* L&W Oct. 7, 2024 Resp. to Evol. Interrogatory No. 1.

RouletteX would infringe one or more claims of the '014 patent.  In view of at least L&W's actual knowledge of the '014 patent, L&W's knowledge that Lightning Roulette embodies the '014 patent, and the substantial similarities between Lightning Roulette and RouletteX, L&W deliberately and intentionally infringed the '014 patent.  At the very least, L&W knew, based on the foregoing, that there was a high probability that RouletteX would infringe one or more claims of the '014 patent, but took deliberate steps to avoid learning of that infringement.

177.    In addition, by letters dated February 28, 2022, April 24, 2024, March 14, 2025, Evolution thrice put L&W on notice that RouletteX infringes the '014 patent and included explanation and citations to evidence showing how RouletteX infringes.  L&W's continued infringement of the '014 patent, despite Evolution's notice, is deliberate and intentional.

178.    On information and belief, L&W has intentionally instructed, and will intentionally instruct, others, including casinos, game operators, and players, to use RouletteX and 88 Fortunes Blaze Live Roulette in a manner that infringes the '014 patent, literally or under the doctrine of equivalents.  For example, as is typical in the gaming industry, L&W directly advertises RouletteX and 88 Fortunes Blaze Live Roulette to casinos and game operators to encourage them to offer RouletteX and 88 Fortunes Blaze Live Roulette in their casinos.  For example, L&W promoted RouletteX in 2021, 2022, 2023, and 2024 and 88 Fortunes Blaze Live Roulette in 2024 at the Global Gaming Expo, which is held annually in Las Vegas, Nevada.[131]  The Global Gaming Expo is widely attended by the global gaming community, including representatives from casinos and gaming operators, and used by vendors, including L&W, to promote their products.  And, in fact, casinos are offering RouletteX on their floors for players to use and thus directly infringe the '014 patent.[132]  Additionally, L&W broadcasts 88 Fortunes Blaze Live Roulette from its studios

---

[131] *See* https://explore.lnw.com/newsroom/scientific-games-is-driving-the-future-of-gaming/ (2021); *see also* https://www.youtube.com/watch?v=7e22FFSWTac (2022); https://www.youtube.com/watch?v=B9sGivHKgiA (2023); https://www.youtube.com/watch?v=AItaRI6iaCo (2024).

[132] *See, e.g.*, https://www.linkedin.com/posts/lightnwonder_youre-looking-at-the-very-first-install-activity-7043692695092924416-kS6u?utm_source=share&utm_medium=member_desktop.

in Michigan and/or elsewhere in the United States for players to use and thus directly infringe the '014 patent.[133]  L&W knows or has been willfully blind to the fact that such actions are inducing, and will induce, infringement.  The foregoing actions by L&W constitute, and will constitute, induced infringement of one or more claims of the '014 patent in violation of 35 U.S.C. § 271(b).

179.    Upon information and belief, L&W has supplied and continues to supply from the United States all or a substantial portion of its infringing RouletteX system and induced and continues to induce the combination of such components outside of the United States in a manner that would infringe the '014 patent if it occurred within the United States.  Upon information and belief, L&W has exported the infringing RouletteX system from the United States to at least Europe and Asia.[134]  For example, L&W (then, Scientific Games) announced through its LinkedIn page that its RouletteX game terminals are live in Finland and the UK, and encouraged customers to contact their L&W sales representatives:

---

[133] *See* https://explore.lnw.com/newsroom/light-wonder-premium-live-dealer-by-authentic-gaming-goes-live-with-betrivers-in-landmark-u-s-launch/; https://www.linkedin.com/posts/lnw-live_88fortuneslive-livecasino-fortunatenewyear-activity-7279830021098098689-Ej2e/?utm_source=share&utm_medium=member_desktop.

[134] *See e.g.*, https://explore.lnw.com/newsroom/light-wonder-builds-new-worlds-of-play-at-g2e-asia-in-singapore/ ("Light & Wonder also will feature one of its premier ETG experiences, ***RouletteX*TM**."); https://www.ggrasia.com/a-jin-ji-bao-xi-grand-entrance-from-light-wonder/ ("[T]he group's clients in Asia Pacific could look forward to the introduction of RouletteX, which gives players the chance to win up to 500 times the value of their wager on a single number.").



The foregoing actions by L&W constitute infringement of one or more claims of the '014 patent in violation of 35 U.S.C. § 271(f).

180.    L&W's infringement is without the consent or other authority of Evolution. L&W's license to the '014 patent was limited to building a physical Lightning Roulette game table.

181.    L&W's actions are willful and deliberate, and render this an exceptional case under 35 U.S.C. § 285.

182.    Evolution has been damaged by L&W's acts in an amount as yet unknown. Evolution has no adequate legal remedy.  Unless enjoined by this Court, L&W's continued acts of infringement will cause Evolution substantial and irreparable harm.  Under 35 U.S.C. § 283, Evolution is entitled to an injunction barring L&W's from further infringement of the '014 patent.

**FIFTH CAUSE OF ACTION**

**(Infringement of U.S. Patent No. 11,756,371)**

183.    Evolution realleges and incorporates by reference the allegations contained in paragraphs 0–182 as though fully set forth herein.

184.    L&W has infringed and continues to infringe one or more claims of the '371 patent, literally or under the doctrine of equivalents, including, without limitation, claims 1–2, 4–12, 14–22, and 24–30 in violation of 35 U.S.C. § 271(a) by manufacturing, using, importing, selling, and/or offering to sell in the United States at least its RouletteX, PowerX, and 88 Fortunes Blaze Live Roulette systems.  None of the claims are representative of any other claim in the '371 patent or in any other patent owned by Evolution.  For example, Evolution has accused PowerX of infringing the '371 patent, but not the '024 and '014 patents.  That is because the '014 and '024 patents includes different limitations that are distinct from what is claimed in the '371 patent.  As another example, Evolution is accusing RouletteX, PowerX, and 88 Fortunes Blaze Live of infringing claim 1 of the '371 patent, but is accusing only RouletteX and PowerX of infringing claims 7-8 of the '371 patent.

185.    For example, claim 1 of the '371 patent recites:

    (a)    A system for wagering, comprising:

    (b)    a ball;

    (c)    a roulette wheel having a plurality of positions into which the ball can land after a spin of the roulette wheel; and

    (d)    at least one hardware processor collectively configured to:

    (e)    randomly or pseudo-randomly select a first selected position of the plurality of positions on the roulette wheel to have a first increased payout for the spin of the roulette wheel prior to the ball landing into any of the plurality of positions on the roulette wheel for the spin;

    (f)    determine that the ball has landed into the first selected position for the spin; and

    (g)    determine that the first increased payout is applicable to a first bet made on the first selected position for the spin of the roulette wheel,

wherein the first increased payout is greater than a first non-selected payout that would have been applicable to the first bet on the first selected position for the spin had the first selected position not been selected by the randomly or pseudo-randomly selecting the first selected position for the spin.

186.    To the extent the preamble of claim 1 is considered a limitation, each of at least RouletteX, PowerX, and 88 Fortunes Blaze Live Roulette comprises a system for wagering. Additional information is set forth in Exhibit 6 at claim 1(a).

187.    Each of at least RouletteX, PowerX, and 88 Fortunes Blaze Live Roulette comprises a ball.  Additional information is set forth in Exhibit 6 at claim 1(b).

188.    Each of at least RouletteX, PowerX, and 88 Fortunes Blaze Live Roulette comprises a roulette wheel having a plurality of positions into which the ball can land after a spin of the roulette wheel.  Additional information is set forth in Exhibit 6 at claim 1(c).

189.    Each of at least RouletteX, PowerX, and 88 Fortunes Blaze Live Roulette comprises at least one hardware processor.  Additional information is set forth in Exhibit 6 at claim 1(d).

190.    Each of at least RouletteX, PowerX, and 88 Fortunes Blaze Live Roulette comprises at least one hardware processor collectively configured to randomly or pseudo-randomly select a first selected position of the plurality of positions on the roulette wheel to have a first increased payout for the spin of the roulette wheel prior to the ball landing into any of the plurality of positions on the roulette wheel for the spin.  Additional information is set forth in Exhibit 6 at claim 1(e).

191.    Each of at least RouletteX, PowerX, and 88 Fortunes Blaze Live Roulette comprises at least one hardware processor collectively configured to determine that the ball has landed into the first selected position for the spin.  Additional information is set forth in Exhibit 6 at claim 1(f).

192.    Each of at least RouletteX, PowerX, and 88 Fortunes Blaze Live Roulette comprises at least one hardware processor collectively configured to determine that the first

increased payout is applicable to a first bet made on the first selected position for the spin of the roulette wheel, wherein the first increased payout is greater than a first non-selected payout that would have been applicable to the first bet on the first selected position for the spin had the first selected position not been selected by the randomly or pseudo-randomly selecting the first selected position for the spin.  Additional information is set forth in Exhibit 6 at claim 1(g).

193.    As another example, claim 2 of the '371 patent recites:

The system of claim 1, further comprising a display that identifies the first selected position.

194.    Each of at least RouletteX, PowerX, and 88 Fortunes Blaze Live Roulette further "compris[es] a display that identifies the first selected position."  Additional information is set forth in Exhibit 6 at claim 2.

195.    As another example, claim 4 of the '371 patent recites:

The system of claim 1, wherein the at least one hardware processor is further collectively configured to: randomly or pseudo-randomly select a second selected position of the plurality of positions on the roulette wheel to have a second increased payout for the spin of the roulette wheel prior to the ball landing into any of the plurality of positions on the roulette wheel for the spin, wherein the second increased payout for the second selected position is greater than a second non-selected payout that would have been applicable to a second bet on the second selected position for the spin had the second selected position not been selected by the randomly or pseudo-randomly selecting the second selected position for the spin, and wherein the second increased payout is different than the first increased payout.

196.    Each of at least RouletteX, PowerX, and 88 Fortunes Blaze Live Roulette further comprises "wherein the at least one hardware processor is further collectively configured to: randomly or pseudo-randomly select a second selected position of the plurality of positions on the roulette wheel to have a second increased payout for the spin of the roulette wheel prior to the ball landing into any of the plurality of positions on the roulette wheel for the spin, wherein the second increased payout for the second selected position is greater than a second non-selected

payout that would have been applicable to a second bet on the second selected position for the spin had the second selected position not been selected by the randomly or pseudo-randomly selecting the second selected position for the spin, and wherein the second increased payout is different than the first increased payout."  Additional information is set forth in Exhibit 6 at claim 4.

197.   As explained above, L&W had actual knowledge of the '371 patent's parent patent—the '014 patent—and grandparent patent—the '024 patent—because they were expressly identified in the parties' Heads of Terms and March 29, 2021 Agreement as intellectual property that protects Evolution's Lightning Roulette.  In addition, by letter dated February 28, 2022, Evolution put L&W on notice that RouletteX infringes the parent '014 patent and grandparent '024 patent and included explanation and citations to evidence showing how RouletteX infringes those patents.  PowerX infringes the '371 patent in substantially the same way.

198.   In view of at least L&W's actual knowledge of the '024 and '014 patents, L&W's knowledge that Lightning Roulette embodies those patents, and the substantial similarities between Lightning Roulette, on the one hand, and RouletteX and PowerX, on the other, L&W knew that RouletteX and PowerX would also infringe the '371 patent or knew that there was a high probability that RouletteX and PowerX would infringe claims of other patents in the same family as the '024 and '014 patents, including the '371 patent, but took deliberate steps to avoid learning of that infringement.

199.   At minimum, L&W had actual knowledge of the '371 patent since at least April 24, 2024, when Evolution sent a letter to L&W notifying L&W that RouletteX and PowerX infringe the '371 patent and including explanation and citations to evidence showing how RouletteX and PowerX infringe.[135]  In addition, Evolution sent another letter dated March 14, 2025 reiterating its notice from its previous letter that RouletteX and PowerX infringe the '371 patent.

200.   Evolution also, by letter dated March 14, 2025, put L&W on notice that 88 Fortunes Blaze Live Roulette infringes the '371 patent and provided explanation and citations to

---

[135] *See also* L&W Oct. 7, 2024 Resp. to Evol. Interrogatory No. 1.

evidence, including in chart form, showing how 88 Fortunes Blaze Live Roulette infringes. L&W's continued infringement of the '371 patent, despite Evolution's notice and despite L&W's knowledge of this pending lawsuit when it decided to promote and launch 88 Fortunes Blaze Live Roulette, is deliberate and intentional.

201.    On information and belief, L&W has intentionally instructed, and will intentionally instruct, others, including casinos, game operators, and players, to use RouletteX, PowerX, and 88 Fortunes Blaze Live Roulette in a manner that infringes the '371 patent, literally or under the doctrine of equivalents.  For example, as is typical in the gaming industry, L&W directly advertises RouletteX, PowerX, and 88 Fortunes Blaze Live Roulette to casinos and game operators to encourage them to offer them in their casinos.  For example, L&W promoted RouletteX in 2021, 2022, 2023, and 2024, PowerX in 2023 and 2024, and 88 Fortunes Blaze Live Roulette in 2024 at the Global Gaming Expo, which is held annually in Las Vegas, Nevada.[136] The Global Gaming Expo is widely attended by the global gaming community, including representatives from casinos and gaming operators, and used by vendors, including L&W, to promote their products.  And, in fact, casinos are offering RouletteX on their floors for players to use and thus directly infringe the '371 patent.[137]  Additionally, L&W broadcasts 88 Fortunes Blaze Live Roulette from its studios in Michigan and/or elsewhere in the United States floors for players to use and thus directly infringe the '024 patent.[138]  L&W knows or has been willfully blind to the fact that such actions are inducing, and will induce, infringement.  The foregoing actions by L&W

---

[136] *See* https://explore.lnw.com/newsroom/scientific-games-is-driving-the-future-of-gaming/ (2021); *see also* https://www.youtube.com/watch?v=7e22FFSWTac (2022); https://www.youtube.com/watch?v=B9sGivHKgiA (2023); https://www.youtube.com/watch?v=I32uyqj7OPI (2023); https://www.youtube.com/watch?v=OiRqPIa4TsI (2024); https://www.youtube.com/watch?v=AItaRI6iaCo (2024).

[137] *See, e.g.*, https://www.linkedin.com/posts/lightnwonder_youre-looking-at-the-very-first-install-activity-7043692695092924416-kS6u?utm_source=share&utm_medium=member_desktop.

[138] *See* https://explore.lnw.com/newsroom/light-wonder-premium-live-dealer-by-authentic-gaming-goes-live-with-betrivers-in-landmark-u-s-launch/; https://www.linkedin.com/posts/lnw-live_88fortuneslive-livecasino-fortunatenewyear-activity-7279830021098098689-Ej2e/?utm_source=share&utm_medium=member_desktop.

constitute, and will constitute, induced infringement of one or more claims of the '371 patent in violation of 35 U.S.C. § 271(b).

202.    Upon information and belief, L&W has supplied and continues to supply from the United States all or a substantial portion of its infringing RouletteX system and induced and continues to induce the combination of such components outside of the United States in a manner that would infringe the '371 patent if it occurred within the United States.    Upon information and belief, L&W has exported the infringing RouletteX system from the United States to at least Europe and Asia.[139]    For example, L&W (then, Scientific Games) announced through its LinkedIn page that its RouletteX game terminals are live in Finland and the UK, and encouraged customers to contact their L&W sales representatives:

---

[139] *See e.g.*, https://explore.lnw.com/newsroom/light-wonder-builds-new-worlds-of-play-at-g2e-asia-in-singapore/ ("Light & Wonder also will feature one of its premier ETG experiences, ***RouletteX*<sup>TM</sup>.**"); https://www.ggrasia.com/a-jin-ji-bao-xi-grand-entrance-from-light-wonder/ ("[T]he group's clients in Asia Pacific could look forward to the introduction of RouletteX, which gives players the chance to win up to 500 times the value of their wager on a single number.").



The foregoing actions by L&W constitute infringement of one or more claims of the '371 patent in violation of 35 U.S.C. § 271(f).

203.    L&W's infringement is without the consent or other authority of Evolution.

204.    L&W's actions are willful and deliberate, and render this an exceptional case under 35 U.S.C. § 285.

205.    Evolution has been damaged by L&W's acts in an amount as yet unknown. Evolution has no adequate legal remedy.  Unless enjoined by this Court, L&W's continued acts of infringement will cause Evolution substantial and irreparable harm.  Under 35 U.S.C. § 283, Evolution is entitled to an injunction barring L&W's from further infringement of the '371 patent.

**PRAYER FOR RELIEF**

WHEREFORE, Evolution respectfully requests judgment from this Court as follows:

A.      The entry of judgment that L&W has misappropriated Evolution's trade secrets under Defend Trade Secrets Act, 18 U.S.C. § 1836;

B.      The entry of judgment that L&W has misappropriated Evolution's trade secrets under the Nevada Trade Secrets (Uniform Act), NRS 600A;

C.      The entry of judgment that L&W has directly infringed, literally or under the doctrine of equivalents, and/or induced infringement of one or more claims of the Asserted Patents;

D.      The entry of judgment that L&W has willfully infringed one or more claims of the Asserted Patents;

E.      A judgment against L&W preliminarily and permanently enjoining L&W and its officers, employees, agents, attorneys, affiliates, successors, assigns, and others acting in privity or concert with them, and their parents, subsidiaries, divisions, successors and assigns, from further use or disclosure of any of Evolution's trade secret, proprietary, and/or confidential information;

F.      A judgment against L&W preliminarily and permanently enjoining L&W and its officers, employees, agents, attorneys, affiliates, successors, assigns, and others acting in privity or concert with them, and their parents, subsidiaries, divisions, successors and assigns, from further acts of infringement of the Asserted Patents;

G.      A judgment awarding Evolution compensatory, exemplary, and punitive damages resulting from L&W's misappropriation of Evolution's trade secrets in an amount to be determined at a hearing and/or trial, including, but not limited to, double damages for willful or malicious misappropriation under 18 U.S.C. § 1836(b)(3)(C) and/or NRS 600A.050; or in lieu of damages measured by other methods, the damages caused L&W's misappropriation measured by

imposition of liability for a reasonable royalty for L&W's unauthorized disclosure or use of Evolution's trade secrets in an amount to be determined at trial;

        H.      Disgorgement of L&W's wrongfully obtained profits;

        I.      A judgment awarding Evolution damages resulting from L&W's patent infringement in an amount no less than a reasonable royalty or an amount equaling Evolution's lost profits due to L&W's infringement;

        J.      A judgment declaring that this is an exceptional case and awarding Evolution treble damages for L&W's willful patent infringement pursuant to 35 U.S.C. § 284 and attorneys' fees pursuant to 35 U.S.C. § 285;

        K.      A judgment awarding Evolution attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D) and/or NRS 600A.060;

        L.      A judgment against L&W that interests, costs, and expenses be awarded in favor of Evolution; and

        M.      Such other relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

        Evolution hereby demands trial by jury for all causes of action, claims, or issues that are triable as a matter of right to a jury.

        Dated this 10th day of April 2025.

By: _/s/ Jason D. Smith_____
NICHOLAS J. SANTORO, ESQ.
Nevada Bar No. 532
JASON D. SMITH, ESQ.
Nevada Bar No. 9691
**SPENCER FANE**
300 South Fourth Street, Suite 1600
Las Vegas, Nevada 89101
Tel.: (702) 408-3400/ Fax: (702) 408-3401
Email: nsantoro@spencerfane.com
        jdsmith@spencerfane.com

CHING-LEE FUKUDA *(admitted pro hac vice)*
SHARON LEE *(admitted pro hac vice)*
**SIDLEY AUSTIN LLP**
787 Seventh Avenue
New York, NY 10019
(212) 839-5300
Email: clfukuda@sidley.com
        sharon.lee@sidley.com

JOSHUA J. FOUGERE *(admitted pro hac vice)*
**SIDLEY AUSTIN LLP**
1501 K Street, N.W. #600
Washington, DC 20005
(202) 736-8000
Email: jfougere@sidley.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this April 10 2025, a true and correct copy of the foregoing **Plaintiffs' First Amended Complaint** was served upon the parties registered for service with the Court's Case Management and Electronic Case Filing (CM/ECF) system via electronic mail to the addresses of the listed counsel of record below.  In addition, pursuant to LR IA 10-5(d) and LR IC 4-1(c), a courtesy copy was sent via U.S. Mail to the following:

**CAMPBELL & WILLIAMS**
PHILIP R. ERWIN, ESQ.
710 South Seventh Street
Las Vegas, Nevada 89101
Email: pre@cwlawlv.com

**JONES DAY**
HAROLD K. GORDON, ESQ.
*(admitted pro hac vice)*
250 Vesey Street
New York, NY 10281
Email: hkgordon@jonesday.com

JENNIFER D. BENNETT, ESQ.
*(admitted pro hac vice)*
555 California Street
Suite 26th FL
San Francisco, CA 94104
Email: jenniferbennett@jonesday.com

RANDALL E. KAY, ESQ.
*(admitted pro hac vice)*
4655 Executive Drive
Suite 1500
San Diego, CA 92121
Email: rekay@jonesday.com

*Attorneys for Defendants*

Date: April 10, 2025

**JONES DAY**
RYAN K. WALSH, ESQ.
*(admitted pro hac vice)*
LAURA K. VINING, ESQ.
*(admitted pro hac vice)*
1221 Peachtree Street, NE
Suite 400
Atlanta, GA 30361
Email: rkwalsh@jonesday.com
          lkvining@jonesday.com

COLLIN J. KURTENBACH, ESQ.
*(admitted pro hac vice)*
110 N. Wacker Drive
Suite 4800
Chicago, Illinois 60606
Email: ckurtenback@jonesday.com

*/s/ Marissa Vallette* _____
An employee of SPENCER FANE LLP